## PRESIDENT SUSPENDER CO. v. MACWILLIAM.

(District Court, S. D. New York. January 10, 1916.)

1. TRADE-MARKS AND TRADE-NAMES ☞33—CONVEYANCE.
  There is no such thing as the conveyance of a trade-mark in gross, but it must as a matter of law be appurtenant to a business.
  [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 37; Dec. Dig. ☞33.]

2. TRADE-MARKS AND TRADE-NAMES ☞33—CONVEYANCES—EFFECT OF.
  Where, by written instrument, a business, the good will and all tangible assets are conveyed, a trade-mark appurtenant to such business is also conveyed.
  [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 37; Dec. Dig. ☞33.]

3. TRADE-MARKS AND TRADE NAMES ☞35—CONVEYANCES—EFFECT OF.
  An inventor of a new suspender, who licensed plaintiff to manufacture same, conveyed his business as well as the good will and trade-mark. Plaintiff greatly extended the business, by advertising the suspenders which were sold under the name "President" with a tricolored band around the web. Held that, on expiration of the patent, plaintiff retained the trade-mark in the name "President," and the right to use the descriptive band, though the patent became public property.
  [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 39, 40; Dec. Dig. ☞35.]

4. TRADE-MARKS AND TRADE-NAMES ☞35—RIGHT TO TRADE-MARK.
  In such case, plaintiff is after expiration of the patent entitled to the trade-mark, where its value lay, not in the worth of the patent, but in plaintiff's advertising campaign by which large numbers of the suspenders were sold.
  [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 39, 40; Dec. Dig. ☞35.]

5. TRADE-MARKS AND TRADE-NAMES ☞35—RIGHT TO TRADE-MARK.
  In such case, the fact that plaintiff in the course of years associated the name "Shirley" with the name "President," so that the trade-mark became "Shirley President," does not diminish its rights.
  [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 39, 40; Dec. Dig. ☞35.]

6. TRADE-MARKS AND TRADE-NAMES ☞7—WHAT CONSTITUTES.
  The word "President," used in connection with suspenders, is not a descriptive term and may be the subject of trade-mark.
  [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 11; Dec. Dig. ☞7.]

7. TRADE-MARKS AND TRADE-NAMES ☞35—RIGHT TO TRADE-MARK—PAYMENT OF ADVERTISING.
  In such case, though defendant bore a part of the cost of the advertising campaign which caused the extensive sale of the suspenders, that

fact does not entitle him to use the trade-mark; his compensation having been received in increased royalties.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 39, 40; Dec. Dig. &—35.]

8. TRADE-MARKS AND TRADE-NAMES &—70(1)—UNFAIR COMPETITION—WHAT CONSTITUTES.

Defendant, though plaintiff had no trade-mark in the name under which its goods were sold, cannot so dress its own goods as to deceive the public into believing they are purchasing those of plaintiff.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 81; Dec. Dig. &—70(1).]

9. PATENTS &—71—VALIDITY—ANTICIPATION.

Where a design patent for suspenders accompanied by drawings sufficiently showed how they were made, there is no invention in a subsequent mechanical patent which is a mere expansion of the former.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 63; Dec. Dig. &—71.]

In Equity. Suit by the President Suspender Company against Hugh G. Macwilliam, who counterclaimed. Decree for complainant.

Final hearing in equity; suit between citizens of different states; action for unfair competition, for infringement of trade-mark, and also for infringement of Adams patent 687,188, assigned to plaintiff.

Robert Cushman, of Boston, Mass., for plaintiff.
W. P. Preble, of New York City, for defendant.

HOUGH, District Judge. Plaintiff is a corporation which prior to 1914 was known as the C. A. Edgarton Manufacturing Company. It has for many years been engaged in the manufacture and sale of suspenders and garters, and possibly other similar articles. Its corporate existence has been continuous, and it will hereafter be called the "President Company."

Plaintiff's position, summarily stated, is that as the owner of the patent in suit it uses the invention thereof in the manufacture of what it calls and sells as "President Suspenders"; that it has an established trade-mark in the name "President" as applied to suspenders as evidenced by registration and established by long user in connection with its business; and that defendant has lately begun to manufacture and offer for sale a suspender of his own make which he calls by the trade-name "President," dresses or prepares for sale in a manner similar to that long employed by plaintiff, and embodies in his style of suspender the invention of the Adams patent.

It is conclusively proven, and indeed almost admitted, that the alleged infringing article (Macwilliam's suspender) is in all material respects substantially a copy of what defendant has made for at least 14 years.

This litigation grows out of an agreement made between plaintiff and defendant on October 1, 1898, a piece of legal draughtsmanship good enough to withstand criticism under almost any circumstances, yet not drawn with sufficient foreknowledge of the unexampled pecuniary success that lay before the humble invention of a pair of cord back sus-

penders. The parties to this litigation and to that contract are (in a very true sense) here quarreling over the business unexpectedly created by the aforesaid patent and remaining to be fought over upon the expiration thereof.

For some time prior to 1898, Macwilliam was engaged in business in St. Paul, Minn. On August 16, 1898, there was issued to him patent No. 609,286 for a pair of suspenders. It was proven that even in a small way Macwilliam could make this patented suspender and profitably sell it at 50 cents. By October 1, 1898, he could be fairly said to have an established but small business in this patented article. The patent itself was said at bar to have been the subject of some litigation in which success attended the patentee. If this is true, it was not of sufficient importance to give rise to any reported case. See Shepard's Digest of Contested Patents. On the date last mentioned, Macwilliam granted to the President Company a license, exclusive (except as to the state of Minnesota, wherein he had previously made other arrangements with a firm mentioned in the contract) "to manufacture and sell within the United States, to the end of the term for which said letters patent were granted, suspenders containing said patented improvements," subject to certain conditions of which the material ones are as follows:

(a) That Macwilliam should turn over and transfer to the President Company "the good will of his present business of manufacturing and selling said suspenders within the United States, and all orders he now has or may hereafter take within the United States, for the said suspenders."

(b) That Macwilliam will not manufacture or sell suspenders containing said improvements within the United States during the term of said license.

(c) That the President Company should pay Macwilliam a royalty of 25 cents for each dozen pairs of suspenders containing said patented improvement and sold by it, which royalty, however, should not be less than $300 for the first quarter year of the life of the license, and should never thereafter be less than $2,000 per annum.

After the execution of this agreement, Macwilliam closed out his business in St. Paul, shipped to plaintiff his stock in trade, and thereafter and until the expiration of the patent took no part in and exercised no supervision over the business of making suspenders. By agreements, the nature of which is not shown in this litigation, he contributed toward a very extensive advertising campaign on behalf of his suspender, for which he had prior to the grant of his patent devised and used the arbitrary name "President"; and he had also at the same early period habitually put a paper band bearing the colors of the American flag around the web of each pair of his suspenders.

This name and distinctive dressing furnished material for advertising efforts toward which for approximately one-half of the life of the patent Macwilliam contributed two-sevenths and plaintiff five-sevenths.

The expense of advertising was very large, but as a result thereof, and not at all in my opinion as the result of any peculiar merit in

Macwilliam's invention, the business of selling President suspenders enlarged in volume and expanded geographically, until this article of dress has been sold all over the world, and at the rate of 25 cents royalty per dozen pairs Macwilliam has received over and above all his contributions to advertising about half a million dollars.

It is admitted that, not having the benefit of legal advice, the President Company in the early days of its license agreement with Macwilliam conceived the idea that Macwilliam and not themselves should protect by registration the word "President" as a trade-mark. Accordingly, and apparently at the instigation and suggestion of the plaintiff, Macwilliam registered the word "President" as a trade-mark for suspenders on May 16, 1899 (No. 32,965).

As the years passed, as business and profits increased and the termination of the patent began to be thought of, plaintiff (evidently under advice of counsel) conceived the idea that it had come to be the owner of the word "President" as a trade-mark applicable to suspenders, and it in turn registered the same word for the same purpose on February 4, 1913 (No. 90,103).

The President Company has always done business at Shirley, Mass. It manufactured and long had manufactured suspenders of other kinds beside the President, and for some years past and probably as early as 1909 plaintiff began to associate the word "Shirley" with the word "President" in its advertising matter and on boxes and wrappings surrounding its product. It even put the legend (though this was probably at a somewhat later date), "The Shirley President," upon the tri-colored paper band which surrounded, and always has surrounded, a part of the webbing of the President suspender.

I believe the fact to be that, as the expiration of the patent loomed near, plaintiff perceived that Macwilliam was intending to do what he could toward resuming the suspender business as soon as the expiration arrived; and therefore associated the word "Shirley" with the "President" partly because, even if it could not maintain an exclusive hold upon the word "President," it was hoped that the two words together might still be its own peculiar property and become associated with a desired article in the public mind.

It is, however, also true that plaintiff used this word "Shirley" in conjunction with the arbitrary trade-names of other articles of its own manufacture. It was and is now a kind of "house flag" or generic trade-name; whereas (e. g.) "President" is a specific trade-name.

Immediately upon the expiration of the patent on August 15, 1915, Macwilliam did begin to do just what I think he was expected to do and what is the cause of this litigation.

A counterclaim has been embodied in the answer in this case in which Macwilliam sets up his own assertion of right to the trade-mark "President" and seeks to enjoin plaintiff from its continued use.

Contemporaneously with the progress of this cause, there have been two interferences in the Patent Office, a reference to which will save some writing on my part. Without any regard to the two registrations of the word "President" as a trade-mark hereinabove referred to, Macwilliam on June 26, 1914, took time by the forelock and applied

for a registration in his own name of the word "President" as a trademark for suspenders. Against this application the plaintiff herein appeared in opposition, and contemporaneously filed a petition in the office for cancellation of the hereinabove referred to certificate 32,865, granted to Macwilliam on May 16, 1899.

[1, 2] The ground of this petition and opposition is the same as the foundation upon which rests the major portion of this suit. A syllabus may be made of it thus: (a) In 1898 Macwilliam owned a suspender business. (b) He also owned the word "President" as a trademark applied to his suspenders. (c) He had also established the habit of dressing his President suspender with a tricolored band around the web. (d) By October 1, 1898, the President suspender so made, dressed, and sold by him embodied the invention contained in his letters patent 609,286. (e) On the date last given, Macwilliam for a valuable consideration sold the good will of his business and the business itself to the plaintiff. (f) There is no such thing as the conveyance of a trade-mark in gross; it must as matter of law be appurtenant to a business. (g) Also, as a matter of law the sale and transfer by paper writing of the good will of a business, accompanied by a delivery of the tangible assets thereof, is a transfer of the business itself and everything appurtenant or belonging thereto. (h) Thereafter by the skill, energy, and capital of plaintiff the business so transferred, i. e., the business of making and selling President suspenders, has grown; such growth not being dependent upon any peculiar merit in Macwilliam's invention, nor to any personal effort on Macwilliam's part.

Each and all of the foregoing propositions have been resolved in favor of the plaintiff by the examiner of interferences, whose opinions have been submitted to me. With them I concur.

The result in the Patent Office has been that Macwilliam's earlier registration has been canceled and his later attempted registration denied, so that, when this case was submitted, so far as the records were concerned, the plaintiff was the registered owner of the trade-mark "President" as a registered device for suspenders.

The foregoing findings of fact do not seem to me to require expansion. The conclusions of law hereinabove stated are, I think, fully sustained both by reason and the authority of the decisions cited by plaintiff, especially Weener v. Brayton, 152 Mass. 101, 25 N. E. 46, 8 L. R. A. 640; Fairbanks Co. v. Ogden Co., 220 Fed. 1002; and Hopkins on Trade-Marks (2d Ed.) p. 23.

[3] I am therefore of opinion that, although when the patent expired the thing advertised as the President suspender became public property, the business of making that thing and vending it under the name "President," and with the descriptive band around the web, remained by assignment in the hands of the plaintiff.

[4] I am also of opinion that the value which attaches to the trademark in question is so wholly the result of plaintiff's activity that, entirely irrespective of what I believe to be the contractual rights of plaintiff, it would be entitled to retain control of the word as long as it manufactures the thing, on the simple ground that, if it were com-

pelled to share the privilege with another (even Macwilliam), that other would be getting something for nothing.

[5] Nor am I convinced that there is any substance in the contention that the association of the word "Shirley" with "President" has either diminished plaintiff's rights or enlarged those of defendant. Even if it be true that the habit of years has transformed the trademark "President" into the trade-mark "Shirley President," yet it is also true that another man who manufactured the same thing under the name "President" would infringe upon the trade-mark "Shirley President." Foster v. Foster, L. R. 7 (Chan.) 611; Saxlehner v. Eisner, 179 U. S. 19, 21 Sup. Ct. 7, 45 L. Ed. 60.

[6] So far as the trade-mark part of this cause is concerned, the only point that disturbed me when the matter was argued at bar was an inclination to think that, since Macwilliam might manufacture the thing known as "President Suspender," he might call it by the name to which the public was accustomed. I am convinced that this inclination was erroneous: (1) Because the name "President" is not really descriptive. An arbitrary name may become descriptive when there is no other word by which to make description. This is perfectly illustrated by the famous Linoleum Case, but that is not applicable here. (2) I am also now persuaded that I did not give sufficient weight to the evidence, which on consideration shows that (as above indicated) the vogue and success and importance of the word "President" as a trade-mark is not due to the merit of the thing, but to the persistence of the advertising and the push of the plaintiff.

[7] It was also an attractive suggestion on behalf of the defense that, since Macwilliam had contributed to the advertising, the importance of which was never denied, he ought equitably to be admitted to some share in the profits of the business that grew out of that advertising. Upon the whole, I incline to think he has been sufficiently rewarded by the extraordinary profits that have fallen to his share out of this trivial invention. He did contribute to the advertising, but it was the advertising and not the inventive merit that gave him his royalties. Therefore he got his pay out of the royalties and must be presumed to have had that in contemplation when he made the contributions.

But whether the foregoing be legally conclusive or not, these equitable considerations cannot prevail against what I believe to be the necessary and inevitable legal result of the conveyances and course of business hereinabove sufficiently set forth.

[8] To that portion of the bill which complains of unfair competition, there is substantially no defense. Whatever may be Macwilliam's rights in the trade-mark, he cannot appropriate a form of dress which has nothing to do with the trade-name. Centaur Co. v. Hughes, 91 Fed. 901, 34 C. C. A. 127.

[9] The infringement of the Adams patent, which is the other point in this litigation, is of no great importance to the parties, and the patent itself is of still less importance. The only evidence taken against it, and in my judgment the only evidence necessary to defeat it, is Adams' earlier design patent, 33,635. A pair of suspenders is a gar-

ment supporter; any person who is skilled in making garment supporters could, if he had never before heard of a swivel channel way for a cord, know how to make one and how to use it by looking at Adams' design patent.

It is obvious by examining the drawing of the design patent and the mechanical patent that the latter is but an expansion of the former. Whatever addition to the world's knowledge was needed in this respect was given by the design patent, and especially by the drawing thereof. ˙This having been published some seven months before the mechanical patent was applied for, there can be no invention in the patent in suit.

As to the Adams patent, the bill is dismissed. In all other respects the plaintiff may take a decree as prayed for. Costs are awarded to the plaintiff.

⚍For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes