## W. G. REARDON LABORATORIES, Inc., v. B. & B. EXTERMINATORS, Inc., et al.

No. 2112.

District Court, D. Maryland.

May 15, 1933.

468

Thomas W. Y. Clark, of Baltimore, Md., and Howson & Howson, of New York City, for plaintiff.

Robert E. Kanode, of Baltimore, Md., and R. Clyde Cruit, of Washington, D. C., for defendants.

CHESNUT, District Judge.

In this case the plaintiff seeks to enjoin the defendant from the use of the allegedly valid trade-marks "Mouse Seed" and "Rat Seed" as applied to exterminators for rats and mice; and also against unfair competition by the defendant in the sale of these products.

A preliminary injunction was sought and after hearing denied. At that time an opinion was filed which outlined the issues in the case and concluded that on the affidavits of the respective parties the situation was not sufficiently clear to be made the basis of a preliminary injunction. Since then there has been a final hearing with full proof on both sides.

The important and controlling facts developed by the testimony are as follows: Mice and rat poisons have been in common use for many years in various forms, including biscuits, powders and poisoned grains, the last named especially having been in use for 40 years or more. The form of mouse and rat poison involved in this case consists of poisoned grains. The plaintiff uses a yellow canary seed, and the defendant, a mixture of whole and broken grains, mostly of wheat, oats and barley with a pinkish color. Many years ago poisoned grains in bulk used for the extermination of field mice and other rodents

attacking fruit trees (at least in one section of the country, Western Maryland and Virginia) were referred to as "Mouse Seed," but this expression seems not to have been known to or used by those dealing with the subjects in the Department of Agriculture, and there seems to be no literature upon the subject in which the term "Mouse Seed" has been generally applied to these poisoned grains. The first use of the word combination "Mouse Seed" in the sale of poisoned grains for the extermination of mice in houses and buildings, seems to have been by one Green of Providence, R. I., who, in or before 1903, commenced the manufacture and sale for such purposes of a poisoned grain which was sold at retail to the ultimate consumer in a small white box bearing the label "Green's Original Mouse Seed" (the expression obviously implying a considerable prior use of the term "Mouse Seed" either generally or specially). Some time later and prior to 1920, Green sold this business to one Burke, also of Providence, who continued the same form of marketing the product, but also placing his own name on the boxes. In 1920 one Hagedorn of Brooklyn, N. Y., became one of Burke's customers and thereafter for some year or two, sold the product in boxes similar to those used by first, Green, and second, Burke, but under the name of "Marvel Mouse Seed." During this time Hagedorn purchased the poisoned seeds in bulk from Burke. On January 22, 1923, Hagedorn bought out Burke's business entirely and continued the sale of the article under the name of "Marvel Mouse Seed."

In 1925, W. G. Reardon (now president and owner of the plaintiff corporation) advertised for a business connection. Hagedorn answered the advertisement and negotiations ensued for the purchase by Reardon of Hagedorn's business, Reardon being much attracted by the expression "mouse seed" as applied to a rodent poison, having never had any prior connection with the subject-matter. Before purchasing the business he consulted a patent attorney to ascertain whether he could register the term "Mouse Seed" as a trade-mark in the United States Patent Office if he purchased the business, and learned that previously one Theodore Meyer of Philadelphia, had in 1923 registered the term "Mouseed" for the same general article, claiming use since 1910 (but with sales only in Philadelphia, as shown by the testimony). Thereupon Reardon negotiated with Meyer and for the sum of $100 and a very small royalty, obtained from him a so-called license agreement to use the trade-mark "Mouseed," save

in Philadelphia, Washington and Atlantic City. Reardon, not being then advised that he could obtain no rights in a trade-mark whether registered or not except in connection with the business to which it applied, and incorrectly believing that he had thus acquired rights superior to Hagedorn in the use of the term "Mouseed" as a poison for rodents, discontinued negotiations with Hagedorn and promptly began the manufacture and sale from Pt. Chester, N. Y., of a poisoned grain for mice which he prepared and put up for sale through retail dealers in boxes substantially identical in size, shape, color and lettering as those used by Hagedorn, with the exception that Reardon did not use the word "Marvel" in connection with "Mouse Seed," and substituted on the picture of the mouse prominently displayed on the cover of the boxes the letters "R.L." instead of "M.M.S.," which were used by Hagedorn. About the same time Reardon incorporated his business. Reardon obtained from Pease Laboratories in New York and used an entirely different formula for the poisoning of the grain than that used by Meyer or Hagedorn and his predecessors. The form and style in which the Reardon product was marked was an obvious imitation of Hagedorn's package but Reardon seeks to defend his appropriation of such rights, if any, as Hagedorn had on the ground that he felt he had better legal right to use the term "Mouse Seed," and anyhow, sooner or later he expected to buy out Hagedorn's business. Nevertheless he says that he restricted his sales to the neighboring territory of Connecticut where he understood Hagedorn was not marketing his product although Hagedorn's deposition was to the effect that he had sold his product in Connecticut, New Hampshire, New Jersey and New York. Nevertheless Hagedorn took no legal action against Reardon, and on March 26, 1927, Reardon bought out the whole of Hagedorn's business and rights for $5,000 and continued to market his product in the same form, gradually extending the territorial area. On June 30, 1930, Meyer having died, Reardon purchased from his estate for $1,000 all his right to the trade-mark "Mouseed," United States Registration No. 169600, which was assigned to him, Reardon still apparently being under the impression that he could acquire a trade-mark without the business to which it pertained. The agreement nominally included the particular business but in fact Meyer's estate continued the sale of his same product under another name, and Reardon made no change in his own product.

In 1926 and 1927, Reardon began to market his products, both "Mouse Seed" and "Rat Seed," in addition to the small white package referred to, in a larger one-pound package in the form of a cylinder with yellow label on the sides and with green tops and bottoms. The product has been sold in Baltimore since 1926 or 1927 in both forms. In 1927 and 1928 the plaintiff nationally advertised its products as "Mouse Seed," spending about $25,000 in all in so doing; and its aggregate annual gross sales are about $25,000 in amount.

By virtue of national advertising the plaintiff's form of rodent poison has acquired a prominent, if not dominant, position in the retail market but for many years there have also been numerous competing products of the same general character, in the form of poisoned grains of one kind or another, called variously "Sanaseed," "Rat Corn," "Sweeney's Poisoned Wheat," "Extermorat," "Baer's Wheat," etc. The testimony of the witness Stover is to the effect that in very numerous specific instances retail dealers, in several different states, when asked if they carried any mouse seed, produced indifferently or indiscriminately any one or several of these separate preparations in the form of poisoned grains, although probably a majority of the retail dealers, by virtue of the plaintiff's national advertising, are more familiar with the plaintiff's product and would produce it when mouse seed is called for. A number of retail dealers who testified in the case, principally representative Baltimore druggists, most of whom handle only the plaintiff's product, associated the term "Mouse Seed" with the plaintiff's product alone.

The extent to which the plaintiff's product has become identified in the retail trade under the terms "Mouse Seed" and "Rat Seed" does not very satisfactorily appear from the testimony. To some extent the testimony is contradictory and conflicting but considering it all, I think the plaintiff has failed to establish that the terms "Mouse Seed" and "Rat Seed," if not valid trademarks, have acquired a secondary meaning which identifies the product as the manufacture of the plaintiff alone.

The defendant's business was incorporated in 1929, succeeding the Baltimore firm of Barham and Bowersox, one of the partners being the individual defendant in this case named Henry L. Barham. The latter had been acquainted with poisoned grains for rodent exterminators for many years and was familiar with the sale of the product in bulk for the extermination of field mice and other rodents and knew that in some sections it was popularly called "Mouse Seed," and also knew of the product of various manufacturers sold to the retail trade but did not learn of the plaintiff's article sold under the name of "Mouse Seed" until some time in 1928 when his attention was called to it by a distributor of the plaintiff's products in Baltimore. In February of 1930, some months at least before the defendant put out its product under the name of "B. & B. Mouse Seed" for retail sales, the defendant sold a considerable quantity of poisoned seeds in bulk to the Park Board of Baltimore, it being described on the written sales ticket as "Mouse Seed." Some months later the defendant decided to market a poisoned grain for retail distribution and, as Mr. Barham frankly stated, looked over various competing products, including particularly the plaintiff's small package (but not being familiar until much later with plaintiff's larger package) for the purpose, as he said, of meeting the competition. Thereupon the defendant designed the cartons, both the small size and the larger one-pound size complained of by the plaintiff in this case, for the purpose of competing with the plaintiff, and the defendant's product has since then acquired a substantial distribution in the trade in Maryland and some other nearby states, the gross annual sales being between $5,000 and $10,000. There is a marked similarity in the shape and size (and method of packing in the outside container) between the plaintiff's and defendant's small packages respectively. And there is also a considerable similarity in the wording and arrangement of the wording on the two packages. The plaintiff's package as first exposed to the eye of the purchaser reads:

"MOUSE SEED
"(Mouseed)
"Reg. U. S. Pat. Off.
and Foreign Countries

"KILLS MICE"

—followed by a picture of a recumbent mouse in black with conspicuous capital letters "R. L." in white, thereon, followed in turn by the wording:

"Clean
"Ready for use, no bait, no muss"

with a circular form of seal in colors, underneath which is

"Price 25¢"

The defendant's small package on the front of the carton in similar location to that of the plaintiff, has the following printed matter:

"B. & B.

"Mouse Seed

"Kills Mice, Rats & Ground Moles"

—followed by a picture of a mouse looking up, in turn followed by the wording:

"Ready for Use, No Preparation Required

"No Dirt

"Price 25¢"

On the top and bottom of the (2-ounce) carton both packages have the word "Poison"; on the back of each are printed directions which, however, themselves are not very similar. On the same sides of each carton there is the printed matter beginning with the word "Caution" followed by a finer print and the whole similarly spaced and conveying about the same message to the purchaser, followed by the names and factory place of the parties respectively. And also on the corresponding other sides of both cartons there is printed matter headed "Antidote" and giving directions therefor. The conspicuous difference to the eye between the two packages consists principally in color, the plaintiff's package being white and the defendant's orange. When the respective cartons are opened, however, there is an obvious difference in appearance as already noted between the plaintiff's and the defendant's products.

Since the institution of this suit the defendant has changed the wording on the face of its smaller carton by substituting for "B. & B." in the first line as above quoted, the mark "Black Eagle" which it has adopted as a trade brand, the reason for the change as stated by the defendant's officers being that a prominent Chicago firm or corporation which has widely sold somewhat related products under the name of "B. & B." courteously requested the discontinuance of "B. & B." on the defendant's products of this class.

With respect to the larger cartons of the parties containing one pound of the products, the size and general appearance also bear a marked similarity. Both are in cylindrical form and each has on the sides a yellow label with mostly black printed matter, and both have green tops and bottoms.

The testimony does not affirmatively prove intentional and conscious thought on the part of the defendant in the adoption of its form of packages other than is to be inferred from the mere fact of similarity. And there is no substantial testimony to show any intentional "passing off" of the defendant's goods for those of the plaintiff. Obviously jobbers and wholesale dealers who buy in quantity from the respective parties are not deceived and there is no real evidence in the case to show that retailers are deceived. In one or two minor instances a retailer seems to have ordered "Mouse Seed" from a jobber without designating the particular make, and received some make other than the plaintiff's, possibly the defendant's. But there is no positive evidence that ultimate consumers have been or are in fact now being deceived other than is inferable from the circumstances and possibilities of the case.

In the last few years a number of different manufacturers have sold their products under the name of "Mouse Seed" or used that expression on their packages. In two such cases the plaintiff has successfully enjoined, in one there apparently being no contest, and in the other (W. G. Reardon Laboratories v. Miller, 146 Misc. 508, 261 N. Y. S. 594) preliminary injunction having been granted after what is said to have been a brief oral hearing, followed by the submission of one or more briefs, and the contest thereafter abandoned by the defendant.

The suit in this case was not brought until November 12, 1932, after the defendant had been marketing its product about two years, but nevertheless, as the plaintiff says, promptly after the first notice of the defendant's product.

The individual defendants, Barham and Stover, were the chief officers and stockholders of the defendant at the time of the bringing of the suit and actively participated in the marketing of the defendant's product. Since then the defendant Barham has sold his stock and retired from the defendant corporation and is now engaged in a similar business in competition. He has no present financial interest of any kind directly or indirectly in the defendant's business or this particular suit.

On these facts my *conclusion of law* is that the plaintiff is not entitled to a valid trade-mark in the words "Mouse Seed" or "Rat Seed"; but that on the ground of unfair competition the plaintiff is entitled to an injunction against undue similarity in the form, shape, size and general appearance of the defendant's packages. The reasons for these conclusions will be briefly stated.

*As to the trade-marks.*—The function of a trade-mark is to denote origin or ownership of the goods to which it is applied. It confers no monopoly right in the manufac-

472

ture or sale of the goods themselves without the mark. And as every one is entitled to fairly describe the goods which he makes or sells, it necessarily follows that a valid trademark must be susceptible of exclusive use by the particular maker or vendor of the goods, and therefore a merely descriptive mark or name for the goods cannot be valid. Warner & Co. v. Eli Lilly & Co., 265 U. S. 526, 528, 44 S. Ct. 615, 68 L. Ed. 1161; Beckwith's Estate, Inc., v. Commissioner of Patents, 252 U. S. 538, 554, 40 S. Ct. 414, 64 L. Ed. 705; Chapin-Sacks Mfg. Co. v. Hendler Creamery Co., 254 F. 553 (C. C. A. 4); Autoline Oil Co. v. Indian Refining Co., 3 F.(2d) 457 (D. C. Md., Soper, J.); Nims on Unfair Competition and Trade Marks (3d Ed.) § 201. The mark, if descriptive, will not be valid even though it is not exhaustively descriptive if reasonably indicative of the general nature or character of the article. Trinidad Asphalt Mfg. Co. v. Standard Paint Co. (C. C. A.) 163 F. 977, affirmed 220 U. S. 446, 31 S. Ct. 456, 55 L. Ed. 536; Rumford Chemical Works v. Muth (C. C. Md.) 35 F. 524, 527, 1 L. R. A. 44; 38 Cyc. 711. But there is this limitation on the rule—if the words are merely suggestive of the character of the goods or the properties which the owner of the mark wishes the public to attribute to them, and not merely descriptive, then the mark will be good; for instance, Holeproof Hosiery (Holeproof Hosiery Co. v. Wallach Bros. [C. C. A.] 172 F. 859), and Elastic Bookcases (Globe-Wernicke Co. v. Brown [C. C.] 121 F. 185). See, also, Van Camp Sea Food Co., Inc., v. Alexander B. Stewart Organizations, 50 F.(2d) 976 (Cust. & Pat. App.); but compare Van Camp Sea Food Co., Inc., v. Cohn-Hopkins, 56 F.(2d) 797 (C. C. A. 9).

The term "Mouse Seed" is attacked as *descriptive* only and defended as *suggestive* only. Entirely apart from the goods to which it is applied it may carry no certain and precise meaning, but the validity of a trade-mark must be considered not in the *abstract*, but in the *concrete* application to the goods to which it is applied. And as mice and rats are generally regarded as pests there can, I think, be no reasonable doubt that the term "Mouse Seed" as applied to a rodent exterminator is at once indicative that the article so referred to is a poison seed of some character to attract and be eaten by mice and rats as a food. It is thus a term which is fairly descriptive of the general character of the article. The plaintiff contends that the word "seed" is properly descriptive only of something that has germinating force or

character and that in collocation with the word "mouse" it suggests a food to nourish or raise mice rather than a poison to exterminate them. The evidence offered in support of this idea seems to come from persons who are obviously inclined to whimsicality, but, conceding that it is seriously intended, we would still have a situation where the suggestion implied is one not consistent with the properties of the thing sold but, on the contrary, of properties which it does not possess. And it would seem that the suggestion if strong enough would be misleading to the public and therefore defeat itself as tending to establish a valid mark. See Nashville Syrup Co. v. Coca Cola Co. (C. C. A. 6) 215 F. 527, 530, Ann. Cas. 1915B, 358.

Plaintiff's counsel necessarily admits that both words "mouse" and "seed" are common English words in ordinary use but contends that their combination or collocation as applied to the subject-matter is fanciful and arbitrary. But I think not more so than the expressions "bird seed," "bird sand," "fly paper" or "moth balls." The case of Barrett Chemical Co. v. Stern, 176 N. Y. 27, 68 N. E. 65, 66, dealt with a very similar word combination where the plaintiff unsuccessfully endeavored to establish "Roachsault" as a trade-mark for a preparation for destroying roaches and other insects. The defendant called its product "Roach Salt." In denying relief to the plaintiff on the ground that its mark was not valid, the court aptly summarized the applicable law as follows: "The question, therefore, is whether the plaintiff has such an exclusive proprietary right to the use of a common English word, or a combination of such words, as to entitle him to debar all others from the use of the same in the absence of fraud or intent to deceive. The word 'roach' can be used as descriptive of the common insect whose life is sought to be destroyed by the use of the article, and so the word 'salt' may be used, since it is a word in common use to describe chemical preparations and an article for the preparation of food. The two words may be united and used as one word to describe a salt to be used for the purpose of destroying roaches. Where a common word is adopted or placed upon a commercial article for the purpose of identifying its class, grade, style, or quality, or for any purpose other than a reference to or indication of its ownership, it cannot be sustained as a valid trade-mark. Words of this character correctly describing the purpose to which the article is to be put cannot be exclusively used as trade-marks. Columbia Mill Co. v. Alcorn, 150 U. S. 460,

14 S. Ct. 151, 37 L. Ed. 1144; Cooke & Cobb Co. v. Miller, 169 N. Y. 475, 62 N. E. 582. The office of a trade-mark is to point out distinctively the origin or ownership of the article to which it is affixed, and no sign or form of words can be appropriated as a valid trade-mark, which, from the fact conveyed by its primary meaning, others may employ with equal truth, and with equal right, for the same purpose. Elgin National Watch Company v. Illinois Watch-Case Company, 179 U. S. 665, 21 S. Ct. 270, 45 L. Ed. 365. The sole question in the case is whether the plaintiff has a technical trade-mark that has been invaded by the act of the defendant. Both parties are engaged in the same business and both have made use of a common word to describe the character, quality, and use of an article for destroying insect life. The fact that the plaintiff made use of the word before the defendant did not give him the exclusive right to it since it was merely descriptive of the article. There is no allegation or finding that any fraud was intended or committed, or that the defendant by the use of the word palmed off his goods to the public as the goods of the plaintiff. The case, in its legal aspect, is practically the same as if each party had labeled his goods 'Roach Poison,' instead of 'Roach Salt.' They are all common descriptive words indicating to the purchaser of the article that it was a powder or preparation for destroying roaches or other insects; and when the two labels are compared with respect to size, color, character, and advertising caption, descriptive of the thing to which it is attached, they are so dissimilar that it is scarcely possible that any observer possessing reasonable intelligence who wanted to procure the plaintiff's goods would be likely to be deceived or mistake the defendant's article for that of the plaintiff."

 And I think the history of the use of the expression "Mouse Seed," as it appears in the above findings of fact, quite strongly tends to negative the idea that the term by itself was seriously considered a valid trade mark by the plaintiff's predecessors in title. Although the plaintiff's bill of complaint sets up a claim based both on common-law trademark acquired by the plaintiff in succession to Green, Burke and Hagedorn, and also in succession to Meyer as a registered mark, nevertheless at the hearing plaintiff's counsel necessarily abandoned any monopolistic claim in the mark through agreement with or assignment from Meyer, because it is the thoroughly well-established law of trade-marks that they may not be validly assigned apart from the business to which they relate. 15 US CA § 90; Bulte v. Igleheart Bros., 137 F. 492 (C. C. A. 7); Witthaus v. Braun, 44 Md. 303, 22 Am. Rep. 44; President Suspender Co. v. Macwilliam (D. C. N. Y.) 233 F. 433, affirmed (C. C. A.) 238 F. 159, certiorari denied 243 U. S. 636, 37 S. Ct. 399, 61 L. Ed. 941; Standard Brewery Co. of Baltimore City v. Interboro Brewery Co., 229 F. 543 (C. C. A. 2), certiorari dismissed on motion for petitioner, 246 U. S. 677, 38 S. Ct. 315, 62 L. Ed. 934; Nims on Unfair Competition and Trade Marks, § 22. This abandonment of the federal mark did not destroy the jurisdiction of the court as the parties are of diverse citizenship. Coca-Cola Co. v. Old Dominion Beverage Corp., 271 F. 600 (C. C. A. 4).

Green was the first to use "Mouse Seed" for retail package sales and he termed the article "Green's Original Mouse Seed" thus implying at least other uses of the expression. Burke continued the same use but Hagedorn, selling for a while contemporaneously with Burke, (apparently in different territory) used the phrase "Marvel Mouse Seed." At the same time but apparently limited to sales in Philadelphia, Meyer was using the name "Mouseed" as applied to poisoned unhulled oats. When Reardon obtained a so-called license from Meyer he regarded his rights as superior to Hagedorn, so notified the latter and proceeded to sell the product under the name of "Mouse Seed" in disregard and defiance of Hagedorn's right, if any, which Reardon now claims. Furthermore, the wording on Reardon's packages gives notice of registration of "Mouseed" in the United States Patent Office and foreign countries. It is noticeable that the only foreign country in which registration was made by Reardon is in Canada where the name is registered in conjunction with the figure of a mouse bearing the capital letters "R. L."; and the plaintiff has likewise registered its mark in the same form in Maryland and possibly other states. These facts at least raise a serious doubt as to whether the parties (other than Meyer) really considered the term mouse seed as itself constituting a technical trademark. During most of the ten years from 1920 to 1930, there was clearly no exclusive use of the term "Mouse Seed" by any one of the parties named. If Hagedorn in succession to Green and Burke really had a valid common-law trade-mark in mouse seed, then Reardon was clearly violating it by his contemporaneous use of the term unless such use can be defended on the theory that they were operating in different fields. See Hanover

Star Milling Co. v. Metcalf, 240 U. S. 403, 36 S. Ct. 357, 60 L. Ed. 713; United Drug Co. v. Theodore Rectanus Co., 248 U. S. 90, 39 S. Ct. 48, 63 L. Ed. 141; Chapin-Sacks v. Hendler Creamery Co., 254 F. 553 (C. C. A. 4). But under Hagedorn's deposition it is at least very doubtful that they were not overlapping. And the explanation that both Reardon and Hagedorn anticipated that the former would ultimately buy out the latter is not very convincing. The point here is not that Reardon's infringement of Hagedorn's mark, if valid, would excuse the defendant under existing conditions (Potter-Wrighting-ton, Inc., v. Ward Baking Co., 288 F. 597, 603 [D. C. Mass.], affirmed 298 F. 398, 401 [C. C. A. 1]); but that the conduct of the plaintiff and its predecessors is highly suggestive of their real understanding that "Mouse Seed" did not by itself constitute a valid common-law trade-mark.

It is also the well-known trade-mark law as stated in 38 Cyc. p. 699, that: "Words, names and marks already known and in general and common use in the trade cannot be subsequently appropriated by any one as an exclusive trade mark." See, also, Burton v. Stratton (C. C.) 12 F. 696, 700; O'Rourke v. Central City Soap Co., 26 F. 576 (C. C. E. D. Mich.)

Not only is the particular history of the use of this mark suggestive of the probability that the term "Mouse Seed" was generally used in the trade but also there is positive testimony in this case that many years ago in at least one section of the country, poisoned grains in bulk form used to exterminate mice and other rodents were popularly referred to as "mouse seed," and in the retail package trade there is testimony that numerous retail dealers when asked for "Mouse Seed" produced indifferently various separate preparations of poisoned grains. This testimony, it is true, comes principally from the witnesses Barham and Stover who are the individual defendants in the case, and plaintiff's counsel urges that it should not be accepted by reason of their interest in the case and because, as it is argued, it is opposed to the other testimony. But I am not able to dismiss the testimony thus lightly. It is definite and specific and the witnesses whom I saw and heard impressed me as testifying frankly and candidly. Their testimony is not directly contradicted or impeached, but is in part at least corroborated by other witnesses. Barham seems to be the witness with the widest and longest experience of all the witnesses who testified in this case with relation to the commercial sale of the product of poisoned grains as rodent exterminators. He is no longer directly interested in this particular case although it is proper to note, as pointed out by plaintiff's counsel, he may be indirectly interested in that if the mark is not sustained as valid he may afterwards use it in his own business. Furthermore, it seems to me that the testimony accords with the very great probabilities of the situation in the trade. And I am not able to accept the view that all the other testimony in the case is necessarily inconsistent with it. True it is that some of the plaintiff's testimony tends in effect to be contradictory of that of the defendants. Thus retail dealers who handle only the plaintiff's product naturally associate the term "Mouse Seed" with the plaintiff's product alone. Reardon as a witness is even more vitally interested than Stover and Barham. It is also true, I think, that the testimony as to the trade acceptance and understanding of the term "Mouse Seed" has not been as fully and satisfactorily proven as would be desirable. During the argument on the application for preliminary injunction, in anticipation that this might be an important issue in the case, it was suggested that possibly the best way to ascertain the fact as to the trade acceptance and understanding of the term was for counsel on both sides to agree upon some intelligent and disinterested witness who would be engaged to visit the retail trade and under explicit directions as to inquiries to be made, would record and testify as to the retail trade reaction to the term "Mouse Seed." But this suggestion was not adopted. Therefore the facts must be determined from the weight of the testimony as actually given. And I see no sufficient reason for disregarding the effect of the testimony of Barham and Stover which, in its positive aspects, I think, is more weighty than the rather negative contradictory testimony on the part of the plaintiff.

Summarizing the matter, I have found the weight of the testimony to support the conclusion that while the plaintiff by virtue of its national advertising in recent years has probably a dominant position in the retail trade, nevertheless the testimony with regard thereto does not go to the extent of satisfying me that the term "Mouse Seed" as applied to the subject-matter has acquired the secondary meaning of being substantially synonymous with the plaintiff's product alone. And in this connection I have not overlooked the now well-established trade-mark law that even a descriptive mark or name will be protected if it has acquired a secondary significance. Bar-

ton v. Rex-Oil Co., Inc., 29 F.(2d) 474 (C. C. A. 3); Computing Scale Co. v. Standard Computing Scale Co., 118 F. 965 (C. C. A. 6); Chapin-Sacks Mfg. Co. v. Hendler, 254 F. 553 (C. C. A. 4); Nims on Unfair Competition and Trade Marks, § 37; Anheuser-Busch, Inc., v. Budweiser Malt Products Corp. (C. C. A.) 295 F. 306, 309; Coca-Cola Co. v. Koke Co., 254 U. S. 143, 145, 41 S. Ct. 113, 65 L. Ed. 189.

 It is of course more important to know the understanding of consumers with respect to the meaning of "Mouse Seed" than of the retail dealers, but the evidence in this regard in this case is substantially inferable only. I do not recall any specific testimony that any particular purchaser of "Mouse Seed" has been actually deceived in obtaining the defendant's goods which he did not wish instead of the plaintiff's which he did wish. Very possibly such evidence was not readily available even if it in fact existed. Probably the subject-matter is such that the individual purchaser is not very highly concerned as to whose make of mouse poison he gets if the results are satisfactory. However this may be, both the plaintiff with respect to the sale of its goods and the public with respect to its purchases would be entitled to be protected against the defendant's use of "Mouse Seed" if it has been established that the term to the purchasing public meant the plaintiff's product only, but such evidence I find is substantially lacking in this case. The development of a secondary meaning in the public consciousness for a trade expression of this character is one that usually comes only after a long period of years during which the manufacturer of the product has been in substantially exclusive use of the name. There has been no such long-continued user on the part of the plaintiff or its predecessors in this case except in a comparatively restricted territory, as the plaintiff's national advertising and extended field of sales has occurred in the last few years only. If "Mouse Seed" did not constitute a technical common law trade mark in 1927 when the plaintiff began its national advertising, I do not think it should be permitted to monopolize a phrase which is fairly descriptive of the article and of the purpose for which it is intended and by which it is to a considerable extent so known in the trade, merely because by virtue of national advertising it has thereby acquired a dominant position in the trade. If this principle were admitted small manufacturers without adequate capital for national advertising would be fairly at the mercy of those with larger capital resources and could in effect be driven out of business thereby.

 *As to unfair competition.*—While in my opinion the plaintiff is not entitled to protection for the alleged trade mark as such, nevertheless on the grounds of unfair competition I think it is entitled to some relief against the defendant. The facts above recited show an altogether too close and unnecessary similarity of the defendant's packages to those of the plaintiff. In this class of cases it has been frequently said in substance that: "The essence of unfair competition consists in palming off, either directly or indirectly, one person's goods as the goods of another, and this, of course, involves an intent to deceive. * * * It is not necessary to prove intent by direct evidence, where it is clearly to be inferred from circumstances." O. & W. Thum Co. v. Dickinson, 245 F. 609, 621 (C. C. A. 6). And the effect of recent developments of this branch of the law is summarized in Nims on Unfair Competition and Trade Marks, § 9 (a) as follows: *"Passing off no longer a requisite of the unfair competition action.* That this action has expanded in recent years cannot be doubted. It is no longer true that there is no cause of action unless passing off is present. Passing off is but one of various practices that are actionable as unfair competition. The growth has been gradual but constant. At the outset, actual passing off was enjoined. Later, although no actual passing off was proven, injunctions were issued against acts that might result in passing off, if continued. Later still, acts were enjoined which injured the plaintiff even though no passing off was present or threatened. * * * It seems that the touchstone of the legality of conduct of business has become the accepted standard in the community of what is fair play. There was a time when it was not unlawful to pass off one's goods as the goods of another. The decisions that have condemned that practice are nothing less than the judicial recognition of the general feeling that such acts are unfair and inflict injury which the plaintiff cannot fairly be called on to suffer. The nature of the act of passing off has not changed, but our ideas of what is fair, have changed. To such changes the equity judge must necessarily be sensitive."

There is no evidence in this case of any fraudulent attempts by the defendant to deceive the public into buying its goods for those of the plaintiff, but the effect of the undue similarity is likely to create confusion between the respective goods. Under condi-

tions now existing and as reflected in the testimony in this case, for the reasons already stated, I am not of the opinion that a retail dealer is acting unfairly in giving to a customer who asks for mouse seed without specification, express or implied, of the plaintiff's product, either the defendant's or any one of the other similar products on the market of the same general class. But nevertheless the plaintiff is entitled to have such amount of protection from possible confusion as may be given without destroying the rights of the defendant to describe the article by its generic name and the purchasing public is entitled to protection against conditions which would promote confusion between the respective products. The plaintiff has doubtless made some public impression by its national advertising in the association of "Mouse Seed" with its product, and one who has heretofore or hereafter first purchased the plaintiff's product under this name ought to be protected so far as possible from an unintentional purchase of a competing product by reason of superficial similarity. And particularly is this true with regard to the local situation here in Maryland where undoubtedly the plaintiff first occupied the field in the retail trade. Under these conditions it is incumbent upon the defendant to be vigilant to avoid confusion. Hiram Walker & Sons v. Grubman, 224 F. 725, 729 (D. C. S. D. N. Y.); Chapin-Sacks Mfg. Co. v. Hendler, 254 F. 553 (C. C. A. 4); Scriven v. North, 134 F. 366 (C. C. A. 4). Proof of actual confusion is not necessary. Helmet Co. v. Wm. Wrigley, Jr., Co., 245 F. 824 (C. C. A. 6). The mere fact that the defendant places its name upon its carton is not of itself sufficient to prevent confusion. Purchasers, especially of an article of this kind, are not apt to be meticulous in reading all the printed matter on the cartons. A superficial impression is usually sufficient for them. Tillman & Bendel v. California Packing Corp. (C. C. A.) 63 F.(2d) 498, 508.

As to the defendant's smaller package the mere difference in color is, I think, under all the circumstances not sufficiently distinguishing. And in respect to the larger package the color combination is practically the same as that of the plaintiff's larger package. The undue similarities here relate to the packages only and not to the defendant's product itself which is obviously quite different in appearance from that of the plaintiff, after the package is opened.

The plaintiff is entitled to have an injunction against the defendant from continuing the sale of its product in packages in size, shape, color and general appearance of printed matter so far resembling the plaintiff's packages as will create probable confusion. The defendant's use, begun pending this suit, of the lettering prominently displayed on its cartons of "Black Eagle Mouse Seed," is unobjectionable but is not of itself sufficiently distinguishing in view of other similarities. The defendant will be well advised to make a radical departure in the form, size, shape and arrangement of printed matter on its cartons. At this time I think it unnecessary to go further into detail as to what would be a permissible style for distribution of the defendant's package goods.

Plaintiff's bill asks for an accounting of damages and for profits and its counsel asks for a reference of the cause to a master to take the accounting; but the right thereto has not otherwise been discussed by counsel. In this class of cases "a decree for damages or profits does not necessarily follow an injunction." Nims on Unfair Competition and Trade Mark (3d Ed.) § 424. I am not satisfied that conditions here existing require or justify an accounting either for profits or damages. There is no substantial evidence in the case that customers have in fact been deceived or that the defendant has realized profits from deceptive sales or that the plaintiff has sustained any actual damage by the defendant's competition. The burden to prove this was on the plaintiff. Ammon & Person v. Narragansett Dairy Co., 262 F. 880, 884 (C. C. A. 1). Furthermore, the plaintiff delayed for two years in proceeding against the defendant. While the plaintiff is excused from any defence of laches by the statement of its President that he proceeded promptly after first notice of infringement, nevertheless this is indicative that the plaintiff's business was not substantially interfered with by the defendant's competition. Hanover Star Milling Co. v. Metcalf, 240 U. S. 403, 419, 36 S. Ct. 357, 60 L. Ed. 713; Straus v. Notaseme Hosiery Co., 240 U. S. 179, 36 S. Ct. 288, 60 L. Ed. 590; Reid, Murdoch & Co. v. H. P. Coffee Co., 48 F.(2d) 817 (C. C. A. 8); Rushmore v. Badger Brass Mfg. Co., 198 F. 379 (C. C. A. 2); Nims on Unfair Competition and Trade Mark, §§ 424, 424 (b) and 425.

The taxable court costs will be imposed upon the defendant. Counsel may submit a decree in accordance with this opinion.