**CAR-FRESHNER CORPORATION**
v.
**MARLENN PRODUCTS COMPANY, Inc.**
Civ. A. No. 10830.

United States District Court
D. Maryland.
March 30, 1960.

G. Gordon Haines, Baltimore, Md., and Robert F. Conrad, Watson, Cole, Grindle & Watson, Washington, D. C., for plaintiff.

Thomas W. Y. Clark and J. Wesley Everett, Samuels & Clark, Baltimore, Md., for defendant.

R. DORSEY WATKINS, District Judge.

This suit involves separate counts for technical trade-mark infringement under the Lanham Act, 15 U.S.C.A. § 1051 et seq., and for unfair competition due to the manufacture and sale by defendant of a small tree shaped figure of blotter stock material impregnated with a deodorant. An answer was filed by defendant denying any exclusive right of the plaintiff to the tree shaped figure so impregnated; and two counterclaims were filed by defendant; one requesting the cancellation of plaintiff's trade-mark registration because it was improperly granted and improperly used; and the second requesting an injunction against plaintiff's use of a figure comprising a

horseshoe and rose impregnated with a deodorant, this latter claim for relief since having been withdrawn.

Trade-mark Infringement

In August, 1952, plaintiff and its predecessors [1] adopted and have since been using the device of a pine tree in connection with the sale and distribution of perfumed air deodorants. This pine tree included a block-like base and a white panel displayed at a slight angle on the body of the tree. On September 25, 1952, plaintiff's predecessors filed an application for the registration of the tree design, including the slanted panel, the block-like base and the words "Car-Freshener." This application matured into Registration No. 595,047, dated September 14, 1954, which is now owned by the plaintiff, infringement of said registered trade-mark being the cause of action alleged in the first count of the complaint in the instant suit. Upon issuance of the certificate, plaintiff affixed notice of registration to its goods. Plaintiff's product consists of blotter stock die-cut in the shape of a pine tree and dyed a solid color [2] with the exception of a white slanted panel and block-like base with a white panel. In the white slanted panel appear, printed in the same solid color as used on the body of the tree, the words "Car-Freshener" and in the white base panel:

"For 'Forest-Fresh' Air
Car-Freshner Corp.
Watertown, N.Y., U.S.A."

After printing and prior to die cutting, the absorbent blotter stock is impregnated with the desired perfumed air deodorant. The trees are then sealed in cellophane envelopes and twenty-four envelopes stapled to a cardboard easel or display panel. Sales to retailers are of these display cards, the ultimate consumer detaching from the card the number of individual trees he wishes to purchase. As now marketed, the plaintiff's tree carries a small R in a white circle in the center of the tree just above the slanted panel. Plaintiff claims a trade-mark registration on the tree itself. Defendant contends that the actual mark registered was a picture of the plaintiff's tree-shaped dry deodorant, said picture being used on the display cards associated with the merchandising of plaintiff's trees.

Examination of the file wrapper for the granting of the registration on the principal register shows that the initial samples of the use of the mark filed with the application are of a *red* tree printed on a rectangular blotter stock bearing plainly across the slanted panel the words "Car-Freshner" with the notation "Tr. Mk." just above and also within said panel: and at the base within a red margin the inscription:

"For 'Forest-Fresh' Air
Car-Freshner Co.
Watertown, N.Y., U.S.A."

In this application the initial description of goods called for "absorbent material impregnated with air deodorizing and disinfecting material." The application was rejected for the reason that "the mark is dominated by the representation of the goods and the words 'Car-Freshner' which are considered to be merely descriptive as applied to applicant's goods." Upon the suggestion of the Examiner the description of the goods was changed to "an air deodorant and disinfectant" and applicant's attorney stated that the "representation of the tree is in reality a package or container for the goods and distinctive containers have heretofore commonly been registered as trade marks. Such containers certainly identify the source of the goods." A card used in connection with the sale of applicant's goods which suggested va-

1. The business at the time of its organization was a partnership which was succeeded by a proprietorship which, in turn, was converted into the present plaintiff corporation.

2. Plaintiff sells trees of five different colors, each color indicating the alleged scent of that particular tree as, for example, green trees are represented as containing the odor of royal pine; blue trees, bouquet; and red trees, spice.

rious uses of dry deodorants—i. e., in the car, in the kitchen, in the bathroom and in the closet—was submitted to meet Examiner's contention that the words "Car-Freshner" were merely descriptive. The card bore a picture of the tree as shown in the samples initially submitted to indicate the use of the mark. A single rectangular blotter with the tree device imprinted upon it was stapled on the card over the picture of the tree. The description of the goods was next amended to "an air deodorant and perfuming agent." The application was again rejected in part for the reason that:

"Applicant's admission that 'the representation of the tree is in reality a package or container for the goods' supports the Examiner's position that the tree constitutes a representation of the package or container of the goods. Such matter, while it identifies applicant's goods, is only qualified for registry on the Supplemental Register in accordance with the provisions of Section 23 of the Act of July 5, 1946.

"There are no provisions under the act of July 5, 1946 which provide for the registration of the container of the goods or the package of the goods on the Principal Register. Only the Supplemental Register provides for the registration of such marks providing they are capable of distinguishing applicant's goods. Attention is directed to Section 23 of the Act of July 5, 1946 entitled 'Nature of Mark.' "

A further amendment of the description of the goods was made to "an absorbent body impregnated with a perfumed air deodorant" and the argument was then advanced by applicant that "while the absorbent material might be considered a vehicle in which the deodorant is absorbed, it certainly is not a package or container in the ordinary sense of the word." The application was then finally rejected with the statement that only on the Supplemental Register could a package or container be registered, citing various decisions to that

effect. After an interview with the Examiner a further amendment was filed disclaiming registration rights of the words "Car-Freshner" except as used "in connection with the trade-mark as shown" and new facsimiles were filed of a larger display card with the blotter removed and showing the picture of the tree on the card in the position previously intended for the blotter. Various uses for the dry deodorants were suggested on the card, and room for approximately twenty-four envelopes containing plaintiff's products was provided. The applicant's attorney made the following statement in regard to these new specimens: "It is our understanding that the Examiner stated that if specimens were submitted in place of those originally filed with this application and in which the trade-mark is shown printed on a rectangular card, that registration could be obtained. These rectangular cards, therefore are believed to dispose of the Examiner's contention that the drawing merely shows the package or container".

A further amendment was made cancelling that part of the application alleging that the specimens showed the trade-mark as actually used "in connection with such goods, the trade-mark being applied to the goods" and inserting instead "on display cards associated with such goods." The application was then allowed on the Principal Register with the definition of the goods as shown in the registration, being "absorbent body impregnated with a perfumed air deodorant."

Plaintiff urges that the doctrine of file wrapper estoppel, which is frequently applied in patent cases, is not found in trade-mark cases, the reason being that "registration of a trade-mark confers no rights and *limits none,* but is a mere procedural advantage, depending upon common-law ownership. United Drug Co. v. Theodore Rectanus Co., [1918], 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141. "That is to say, plaintiff's right, if it exists, to noninterference by the defendants * * * is determined by common law." (Anheuser-Busch, Inc. v. Cohen,

D.C.Md.1930, 37 F.2d 393, 396—emphasis supplied; accord: Dixi-Cola Laboratories, Inc. v. Coca-Cola Co., 4 Cir., 1941, 117 F.2d 352, 353, certiorari denied 1941, 314 U.S. 629, 62 S.Ct. 60, 86 L.Ed. 505.) This court has not reviewed and summarized the proceedings indicated by the file wrapper for the purpose of raising any estoppel against the plaintiff as to any common law trade-mark rights that it might possess. However, a determination of what actually was registered is obviously necessary for a determination of the issues of the validity of the registered trade-mark, infringement of the registered mark and the alleged misuse of the notice of registration, or false claim of registration, by the plaintiff, through the placing of Ⓡ on the goods themselves.

The certificate issued by the Patent Office contains no statement limiting the manner of the use of the mark by plaintiff. It would nevertheless be unrealistic to ignore the Patent Office proceedings including three rejections of the application on the ground that the tree device constituted a representation of the package or container of the goods and, therefore, was not qualified for registry on the principal register coupled with the fact that registry was granted only when new specimens showing the tree device printed on display cards were submitted to "dispose of the Examiner's contention that the drawing merely shows the package or container." The court is mindful of the Fourth Circuit holding in Denominational Envelope Co. et al. v. Duplex Envelope Co., Inc., 4 Cir., 1935, 80 F.2d 186, 192–193, a patent case, in which Judge Soper speaking for the court said:

"* * * it is the language of the claim, and not the argument of patent counsel which controls. *Of course the claim as allowed must be read and interpreted with reference to the rejected claims,* and to the prior state of the art, *and cannot be construed to cover what was rejected by the Patent Office* or disclosed by prior devices. Doughnut Machine Corporation v. Joe-Lowe Corp. (C.

C.A.) 67 F.2d 135. On the other hand, the solicitors' arguments of themselves set up no estoppel. 'We read the claims as they are written, like the language of any other formal statement drawn up as the final memorial of the parties' intentions, and we decline to consider what was said arguendo during the passage of the case through the Patent Office, or any other of the preliminary negotiations which the patent itself was intended to subsume.'" (Emphasis supplied.)

Assuming, without deciding, that this rule of integration applies to trade-mark as well as patent cases, what was finally registered must be considered in light of what was three times rejected for registration. Moreover the statement of applicant's attorney that new specimens consisting of a display card and five photostatic copies thereof were submitted "to dispose of the Examiner's contention that the drawing merely shows the package or container", although not available to create an estoppel as to plaintiff's common law trade-mark rights, is indicative of what the Examiner finally found qualified for registry on the principal register and is indicative of the fact that he never abandoned his initial position that the tree device when applied directly to the goods constituted a representation of the package or container of the goods and, as such, was not registerable on the principal register. On the basis of the proceedings in the Patent Office, as outlined above, the court holds that the plaintiff did not obtain registration of a pine tree device to be applied to an absorbent body impregnated with a perfumed air deodorant. Registration No. 595,047 is a registration of a picture of plaintiff's product, said picture at the time of registration being used by plaintiff on a non-deodorant impregnated display card associated with the sale of plaintiff's tree shaped dry deodorants.

However, were the plaintiff's position in regard to what constitutes its registered mark correct, the court would

hold that such registration as of September 14, 1954 was improperly granted. Plaintiff claims usage of its alleged trade-mark on its product but, in fact, the alleged trade-mark is its product. They are co-extensive—the product and the alleged mark, registration of which the Patent Office finally refused. The fact that a trade-mark cannot be the article itself applies to both common law trade-marks and to those registered. Alan Wood Steel Company v. Watson, D.C.D.C. 1957, 150 F.Supp. 861, 862–863; Callman, Unfair Competition & Trade-Marks, 2nd Edition, Vol. 3, section 71.4, page 1103. A mistaken registration would not remove this disability. The freedom to apply a trade-mark to an article provided by section 1127 of Title 15 U.S.C.A. does not extend to making the mark identical to the article. That the mark, as now claimed by the plaintiff, and the article, are identical is evidenced by plaintiff's motion for a preliminary injunction enjoining the defendant from "making and selling packaged deodorant bodies in the shape of a pine tree, and such packaged deodorants having a block-like base and white panel displayed on the body of the tree"; the ground alleged in support of the granting of such relief being that "on or about August, 1952, plaintiff originated a packaged deodorant in the shape of a pine tree. This pine tree included a block-like base and a white panel displayed at a slight angle on the body of the tree. In connection with this product plaintiff obtained a United States Trade-mark Registration No. 595,047, on September 14, 1954."

Goodyear Tire & Rubber Co. v. Robertson, D.C.Md.1927, 18 F.2d 639, affirmed 4 Cir., 1928, 25 F.2d 833 was an action to require the Commissioner of Patents to issue a trade-mark registration on the design of a section of an automobile tire which involved a plurality of diamond shaped projections on the tire casing. Although the application contained a description in words of distinctive features of the trade-mark, the actual illustration or picture of the design of the portion of the tread was the matter on which registration was requested. The district court quoted with approval from the memorandum opinion of the Court of Appeals of the District of Columbia Circuit affirming the rejection of registration by the Patent Office for the following reason:

" * * * 'The diamond-shaped projections which appellant claims as a trade-mark are clearly descriptive of the goods on which they are used, since they form a very essential part of the goods itself. In other words, these projections are molded on the face of a rubber tire, either to enhance the wear, or to prevent skidding, or both. Section 5 of the Trade-Mark Act of 1905 * * * among other things provides "that no mark, which consists merely in * * * devices which are descriptive of the goods with which they are used, shall be registered." *As suggested in brief of counsel for the Patent Office, "the most accurate way of describing an article is possibly by the article itself".'* " (18 F. 2d at page 639; emphasis supplied.)

The court then continued:

"The complainant nevertheless contends that it is not seeking to register the article itself—that is, the tire—but only so much thereof as is indicated by the words 'a band of diamond-shaped figures.' These words, it says, accurately describe the mark and may be applied to anything in the world, without affording the slightest information of its nature or quality. Section 5 of the Trade-Mark Act (Comp.St. § 9490) contemplates that even the name of an individual may be a trade-mark, if written, printed, impressed, or woven in some particular or distinctive manner, and it has been decided that it is no objection to the validity of an otherwise good mark that it is impressed upon or inherent in the article manufactured, as in the case of a watermark upon paper, a word or symbol blown into a glass bottle or jar, or an arbitrary mark on the

head of a horseshoe nail. Samson Cordage Works v. Puritan Cordage Mills (C.C.A.) 211 F. 603, 605, [L.R. A.1915F, 1107].

"But it is quite clear that the complainant does not seek to register a definitely specified mark as an arbitrary symbol indicative of the origin of the goods, apart from the goods themselves, but a mark which, if not an essential, is at least an important part thereof. It consists of outstanding diamond-shaped blocks disposed circumferentially upon the tire so as to form the tread. If an attempt were made to register as a trade-mark applicable to automobile tires the words 'diamond-shaped tread,' no one could contend that the words were not descriptive of the goods. It is certain that the complainant is no better off by adopting the diamond-shaped tread itself to convey the idea." (18 F.2d at pages 639–640.)

\* \* \* \* \*

"Registration of the diamond tread is improper, also, because it is a functional part of the tire. The Trade-Mark Act of the United States does not purport to create trademarks. It provides merely for registration of them by the owner, while the property in them, the right to their exclusive use, and their characteristics generally, rest upon the laws of the several states. A trademark may be defined as a distinctive name, word, mark, emblem, design, symbol, or device used in lawful commerce, to indicate or authenticate the source from which has come, or through which has passed, the chattel upon or to which it is applied or affixed. Hopkins on Trade-Marks, § 3. McLean v. Fleming, 96 U.S. 245, 24 L.Ed. 828; Mfg. Co. v. Trainer, 101 U.S. 51, 25 L.Ed. 993.

"But the chattel itself is not and cannot be the trade-mark. Moreover, while a mark otherwise good may be so fabricated with the goods as to be integral therewith, yet, if it forms a useful and functional part of the whole, it is not a valid trademark and may not be registered. Otherwise the owner would secure not merely the exclusive right to use the mark, but also the exclusive right to make the article itself, and would thus secure a perpetual monopoly irrespective of patentability." (18 F.2d at page 641.)

■■ In the instant case it is likewise contended by the defendant that the tree, the slanted panel and the block-like base are functional for reasons of artistry and economy. The court has carefully reviewed the testimony and finds that this defense is unproven. While the blotter-stock holds the fragrance, nevertheless its shape is not an essential feature. The products of the parties to this suit are dry air deodorants. The products are purchased for the purpose of perfuming the air and eliminating undesirable odors. The shape of the blotter which contains the fragrance is nonessential and performs no part in the intended function of the goods. "A feature is non-functional if, when omitted, nothing of substantial value in the goods is lost." A.L.I. Restatement, Torts, section 742, Comment (a).

■ However, plaintiff's tree device is clearly descriptive of the ingredients, properties and function of its product and therefore incapable, in the absence of an acquired secondary meaning, of being a trade-mark. Section 715(c) of A.L.I. Restatement, Torts, states in part that, except as set out in sections 720–722, a trade-mark may not be "a designation descriptive of the goods or of their quality, *ingredients, properties or functions.*" [3] Section 721 elaborates upon this general rule as follows: "A designation cannot be a Trade-mark for goods if it is likely to be regarded by prospective purchasers as a common name or generic name for such goods or as *descriptive of them* or of their *in-*

---

3. Emphasis supplied.

*gredients*, quality, *properties, functions or uses.*"[3] *Comment a* under section 721 contains the qualification that the fact that "a designation may have a suggestive significance in connection with the goods does not render it inappropriate for use as a trade-mark. The test is the imaginativeness involved in the suggestion, that is, whether the suggestion is so close and direct that it is apparently descriptive and generally useful in approximately that form to all merchants marketing such goods or is so remote and subtle that it is fanciful and not needed by other merchants or similar goods." Plaintiff argues that its tree device is not descriptive nor even suggestive of a pine scent for two reasons— first that the fragrance used on the plaintiff's green trees does not resemble a true pine scent and secondly, that the plaintiff employs its tree design in connection with colors other than green for scents other than those having any similarity to the scent of pine. That the plaintiff does not or cannot reproduce any absolutely true pine scent in its dry deodorants or that it sells tree shaped deodorants in scents other than that of pine is immaterial. The tree shape when applied to "an absorbent body impregnated with a perfumed air deodorant" is obviously descriptive of the fact that the goods contain certain "ingredients or properties"—to wit, fragrances reminiscent of the forest and further describes the function and use of the product to kill unpleasant odors and leave the air "forest fresh." As stated previously, in the base panel of the tree device appear the words:

"For 'Forest-Fresh' Air
Car-Freshner Corp.
Watertown, N.Y., U.S.A."

Moreover, the display card submitted to the Patent Office, and which was used by plaintiff almost from the inception of its business in August 1952 through February 1955, bore the inscription "Makes air in your car and home fresh and fragrant as in a Pine Forest." Plaintiff's present display card, 14 inches by 14½ inches, contains the wording "Leaves Air 'Forest-Fresh' ", "For 'Forest-Fresh' Air" or " 'Forest-Freshens' " approximately fifteen times. In addition each of the twenty-four cellophane wrapped trees stapled to the display card has printed on both sides "For 'Forest-Fresh' Air." Paraphrasing the holding in the Goodyear Tire case, supra, 18 F.2d 639, 640, if an attempt were made to register as a trade-mark applicable to dry air deodorants the term "Forest-Fresh", no one could contend that the words were not descriptive of the alleged ingredients, properties, functions and uses of goods. It is certain that the complainant is no better off by adopting the tree device itself to convey the same idea.

Plaintiff urges that even descriptive marks are entitled to protection and may be monopolized if they have acquired a secondary meaning. This is quite true as an abstract statement of the law. However, the present consideration by the court is limited to the question of what was actually, and properly as of September 14, 1954, registered as the result of plaintiff's application of September 25, 1952. Under the facts in this case secondary meaning could scarcely have been acquired at the time of the filing of the application for registration of the tree device on September 25, 1952, as the device was first used and adopted in August 1952; nor was an attempt made to submit to the Examiner evidence of secondary meaning. In this connection it should be noted that it was not until December 1955 that the plaintiff itself began using on its letterheads the motto "Manufacturers of the Famous 'Little Trees' ". Thereafter, as plaintiff's stock of other stationery such as labels, invoices and so on ran out, this motto was added to new supplies when, and as, ordered.[4] Also relevant to the issue of secondary meaning is the fact that it was

3. Emphasis supplied.

4. Testimony of Julius Samann, a director of the plaintiff corporation and first assignee of the trade-mark in suit—Transcript, page 30.

not until March 24, 1959 that plaintiff obtained registration on the principal register of the trade-mark "Car-Freshner", said registration being based on an application filed September 17, 1957 and granted only upon a showing by plaintiff of secondary meaning.[5] Accordingly, the Examiner was correct in refusing registration of the tree device itself as it was not only descriptive of the ingredients, properties, functions and uses of the plaintiff's goods and had acquired no secondary meaning, but also, in fact, constituted the article or chattel sold by the plaintiff.

The Examiner, however, was clearly in error in allowing the representation of the goods even in picture form to be registered, in the absence of secondary meaning, as the holding of the Patent Office Trademark Trial and Appeal Board indicates in the case of In re Underberg-Albrecht, 1959, 120 U.S.P.Q. 495, where in refusing registration it was stated at pages 495–496:

"* * * What is sought to be registered represents bottles (with and without wrapping) of applicant's bitters arranged in such a manner as to disclose all of the matter which appears on the labels thereof. This representation is imprinted on a display carton from which the bottle bitters may be sold.

"A reproduction on a display carton of the contents of such carton, i. e., bottles containing the product, merely constitutes a means of informing the prospective purchaser that that carton contains the product depicted. That is to say, it is a picture of the product itself and functions to point to the product and the contents of the carton rather than as a mark to identify the origin of the product.

"There is nothing in the record which indicates that the purchasing public relies upon the pictorial representation of applicant's goods separate and apart from the word mark 'UNDERBERG' as a means of identifying applicant's goods as to source. The record does not support a finding that the pictorial representation of the bottles of applicant's bitters is a mark identifying and distinguishing applicant's goods."

Moreover, if, as this court has found, the plaintiff's tree device as applied to blotter stock was not registerable, a fortiori, a picture of the plaintiff's tree-shaped product used on display cards should not have been registered for through the registration of the picture, which constituted a recognition of plaintiff's alleged pre-existing trade-mark right in its tree device, plaintiff could assert its common law and statutory rights to monopolistic protection of its tree shaped product and would have the benefit of all of the substantive,[6] pro-

---

5. Testimony of same director referred to in footnote 4 above and assignor of the trade-mark "Car-Freshner"—Transcript, pages 90–91.

6. It should be noted that the holdings of this district and the Court of Appeals for the Fourth Circuit, previously quoted, to the effect that "registration of a trade-mark confers no rights and limits none, but is a mere procedural advantage, depending upon common-law ownership" were holdings prior to the Lanham Trade-Mark Act of 1946. While the present Act does grant substantive advantages, the holdings of this district and the Court of Appeals for the Fourth Circuit apply to the present Act to the extent that initially registration grants no greater rights than those recognized at common law.

"* * * Even though it is accepted doctrine that federal registration does not create a trade-mark (the mark originates from use, not registration), the Lanham Act 'did indeed put federal trade-mark law upon a new footing,' and 'put an end to any doubts' as to whether or not it created 'a substantive federal trade-mark law.' The Act introduces the concepts of incontestability of registration and of the right to use a registered mark, the latter right being dependent upon registration of the mark on one of the federal registers. These concepts are concededly more substantive than procedural.

* * * * *

cedural and remedial advantages provided for by the Lanham Act which the refusal of the Examiner to register the article itself had theretofore properly denied to the plaintiff. Callmann, Unfair Competition and Trade-Marks, 2nd Edition, Vol. 3, section 84.1(a), page 1632 states the following rule in regard to defendant's manner of use of plaintiff's mark:

"And there is no distinction between the manner in which a mark is used; it may be found in labels, signs, prints, packages, wrappers, receptacles, or advertisements, as a mark printed in newspapers, pamphlets, stationery, etc. or it may be referred to orally in sales talk or radio advertisement. *The concept of use is broader for the purposes of determining infringement than it is in connection with the problem of acquisition of a trademark by its first user.*" (Emphasis supplied.)

Thus in American Insulation Company v. Eternit Roofing Corporation et al., D. C.N.Y.1926, 14 F.2d 235 where plaintiff owned a federal registration for the mark "Eternit," the certificate of registration stating that the mark is "applied to the shingles themselves, or to tags attached to the shingles," the court found defendant's use of "Eternit" as part of its corporate name only, constituted trade-mark infringement. In Jantzen Knitting Mills v. Spokane Knitting Mills, D.C.Wash. 1930, 44 F.2d 656, defendant used plaintiff's registered design only in advertisements and the court held that such use was an infringement. Although in both of these cases, the defendants' method of use differed from the manner of use described in plaintiffs' certificates of registration, nevertheless findings of trade-

mark infringement were made since the word or design regardless of how used by the defendants constituted colorable imitations or simulations of the plaintiffs' registered marks. If, therefore, in the instant case the plaintiff's registration of a picture of its product used on display cards associated with its goods were held to be valid and the defendant manufactured a colorable imitation not of a display card but of the goods themselves, i. e., the tree shaped deodorants, such a use would constitute an infringement of the registered trade-mark even although the plaintiff could not have obtained a valid trade-mark registration on the goods themselves. Thus, to reiterate, the plaintiff could obtain by indirection recognition of its alleged preexisting right to a monopolistic position that it could not obtain by direct means. Accordingly, the court holds that based on its application of September 25, 1952, as amended, the plaintiff was not entitled as of September 14, 1954 to a registration of a representation of its product in picture form.

### Unfair Competition

Plaintiff and defendant are competitors. Both manufacture and sell perfumed air deodorants through the same channels of trade to the same class of purchasers. Plaintiff is a New York corporation having its principal place of business in Watertown, New York. Defendant was incorporated in the State of Maryland on August 1, 1956. Since August 3, 1952, plaintiff and its predecessors (hereinafter referred to as plaintiff) have sold over ten million packaged deodorants in the shape of a pine tree, having an estimated dollar value received by the plaintiff from said sales of over one million dollars. Plaintiff's tree de-

---

"Registration does not perfect a trademark right; and though under the Lanham Act it does confer certain new rights to the mark, at the outset it does not grant any greater right than that which is recognized at common law without registration. Therefore, the practice or rulings of the Patent Office cannot create a conclusive vested right in the registrant, except as provided by the

incontestability clause. Registration offers no refuge for the infringer. Subsequent failure to register, the invalidity of a registration, or a subsequent cancellation does not affect trade-mark rights. These are determined wholly by the principles of common law." (Callmann, Unfair Competition and Trade-Marks, 2nd Edition, Vol. 4, section 97.3 (a), pages 2067–2069.)

vice has been used and is still being used extensively. It has been prominently exhibited by plaintiff at trade shows; it is used on shipping containers, on plaintiff's stationery, advertising and promotional material, and display cards. A wooden replica of the device, about three feet high, is displayed outside the office and factory of the plaintiff in Watertown, New York. Plaintiff's products have been sold throughout the United States.

The tree-shaped dry deodorant of the defendant is virtually a Chinese copy of plaintiff's tree-shaped product. Both trees are substantially the same size. Both have the same number of bulges or branches. Both have a white slanted panel inclined in the same direction at approximately six and one-half degrees from the horizontal. In its dimensions, defendant's slanted panel is the same as that employed by plaintiff. The white block-like bases appearing at the bottom of the trees also have the same dimensions. In the block-like base of its tree, defendant uses the expression "For Fragrant Forest Pine." Plaintiff's expression in its block-like base is "For 'Forest-Fresh' Air." The connotation of both expressions, the lettering and style of printing bear a remarkable similarity, a similarity that even the president of the defendant corporation was forced to admit existed. This similarity as well as all of those noted above and others to be mentioned later, was explained by defendant's president as one of a series of "coincidences." [7]

The conclusion that defendant's tree device is virtually indistinguishable from plaintiff's tree device is supported by ample evidence that this in fact was the very end result desired by the defendant in that the defendant deliberately and wilfully set out to, and did, copy plaintiff's tree. Martin I. Caplan, defendant's president, in August 1955 and Leonard A. Irving, vice-president of defendant, in July 1955 went to work for the Continental-Midway Corporation (Continental) of Baltimore, Maryland and continued in this employment until July 1956 shortly after a disastrous fire almost completely burned out Continental. During this time Continental manufactured, among other dry deodorants, two tree-shaped deodorants; one a conventional pine tree shape of various colors, some of which were green with figures of birds printed on the tree in red. The other deodorant consisted of a nonconventional or more fanciful tree shape upon which the figure of a wood nymph was superimposed, the outline of the tree and the nymph being coextensive. Neither of these tree devices bore a white slanted panel inclined in the same direction as that on the plaintiff's and defendant's trees at approximately six and one-half degrees from the horizontal, a block-like base, nor the lettering and style of printing used by both plaintiff and defendant. Moreover, Continental employed three colors on its tree products; to the eye these multi-colored trees are readily distinguishable from both plaintiff's and defendant's single color trees. Plaintiff upon learning of Continental's conventional pine tree product with figures of birds in the tree claimed infringement thereby of its registered trade-mark and, according to the testimony of Mr. Samann (a director of plaintiff corporation), a request was made to the president of Continental for the discontinuance of the manufacture and sale by that corporation of said conventional tree shaped deodorant. This request was followed by a letter dated April 10, 1956 to Continental's president from Julius Samann of the plaintiff corporation stating, in part, "I was very glad to hear from you that you are discontinuing the manufacture of the tree." The admissibility of this letter into evidence was objected to by defendant on the grounds that it was hearsay and a self-serving declaration. The above quoted statement was excluded but not the following paragraph of the letter stating:

7. Testimony of Martin I. Caplan—Transcript, page 147.

**32**

"As it may be of some interest to you, my certificates are as follows:

" 'Car-Freshner' tree:
"Date of first use August 6, 1952. Trade-Mark registration No. 595,-057. Copyright registration No. KK-94401. * * * "

The letter was then admitted by the court solely for the purpose of negating the implication of any abandonment [8] by plaintiff of its rights. The court adheres to this ruling. However, defendant's counsel also challenged the fact that the letter was sent and may or may not be authentic, a challenge which would be supported by the unequivocal testimony of Mr. Irving, if such testimony be believed, that during the period of his employment by Continental, from July 15, 1955 through July 31, 1956, at no time was any warning ever received that Continental should not, or could not lawfully, produce the type of tree in question. Mr. Irving further stated "I say emphatically I would have absolutely known about it had anything [in the nature of a warning regarding alleged infringement] existed. Had there been a possibility, I would have known it thoroughly." [9] In view of Mr. Irving's decided proclivity for answering "emphatically," and in support of his case, any and all

questions addressed to him by his counsel, an inclination which led to many substantial discrepancies and serious contradictions in his testimony throughout the entire trial of the case, the court reaffirms its ruling that testimony by Mr. Samann as to the mailing of the letter in question carries a presumption of its receipt, which presumption has not been rebutted, entirely apart from any effect which might otherwise be given to the fact that it was a registered letter, if such be the case.[10]

Assuming receipt of the letter by Continental, by Mr. Irving's own testimony he would have known on April 13, 1956 of plaintiff's claim to a valid trade-mark and of what the alleged trade-mark consisted. However, the court need not, and does not, make such a finding. There is more than a preponderance of the evidence to show that at the time defendant "created" its tree device it not only was aware of, but had in its possession samples of, plaintiff's product.

Mr. Irving testified that while still in the employ of Continental he visited a trade show in February 1956, that at the show he saw the products of other manufacturers of dry deodorants and that he was well aware of plaintiff Car-Freshner's products including their tree-shaped deodorant.[11] Both Mr. Caplan and Mr.

8. There was testimony to the effect that Continental continued manufacturing its alleged infringing tree product after the notice of April 1956; that, in fact, the manufacture and sale of its tree shaped deodorant continued until the corporation went into bankruptcy.

At the close of the trial, counsel for the defendant quite fairly indicated that the defendant would not contend that there had been any abandonment by plaintiff of any claim of infringement with respect to the Car-Freshner tree or any relinquishment of, or impairment of, any right with respect thereto by the failure of plaintiff to bring suit against Continental, its president or its associated companies. (Transcript, page 583.)

9. Testimony of Mr. Irving—Transcript, pages 335–336.

10. The letter admitted into evidence was a carbon copy, all correspondence in the

files of Continental having been destroyed. Testimony established that the letter was written, sealed in an air mail envelope, addressed and mailed by Mr. Samann from Switzerland. A duplicate of a registered receipt for a letter addressed to the president of Continental and mailed on April 10, 1956, the original of which receipt is in Zug, Switzerland, and a certified copy of a registry notice showing receipt on April 13, 1956 of a letter addressed to the president of Continental were offered into evidence. Mr. Samann testified that both related to the letter of warning in question.

11. "Q. When you worked for Midway, did you visit trade shows? A. Yes, I was at one trade show in February 1956.
"Q. Was that the first such one you attended? A. That was the first such one I attended.
"Q. At the show did you see the products of your competitors? A. I certainly did.

Irving left the Continental Corporation on July 31, 1956. The next day, August 1, 1956 they formed a corporation of their own called the Marlenn Products Company, Inc. (the instant defendant). One day later, on August 2, 1956 they sold their first product—"Lucky Rose," a dry deodorant in the shape of a horseshoe with an artificial rose attached. Therefore, it is evident that they were planning to leave and compete with their employer while still in its employ, thereby undermining a business which was already under considerable stress due to a disastrous fire occurring in June 1956.[12] On November 25, 1957 the following letter (read into the record—see Transcript, pages 425–426), was sent to defendant's patent counsel:

"Some time ago I phoned you with regards to the enclosed product.[13] I explained that the manufacturer had a patent mark on his display card and that we wished to manufacture a similar type of tree and wished you to make a search for us to determine whether the patent held by this company is valid and just what it comprises.

"I would appreciate your obtaining this information as quick as possible so that we can proceed one way or the other with our product. Thanks for your cooperation.

"Very truly yours,
Marlenn Products Company, Inc.
(signed) Lenn Irving."

Without waiting for advice from counsel,[14] Mr. Caplan and Mr. Irving on December 5, 1957 took the first step toward the "creation" of their tree shaped product by submitting to a Mr. Meyer, who was engaged in the printing and lithographing business, a sketch of a pine tree prepared by Mr. Irving. Mr. Meyer was to make the necessary technical arrangements for mass production printing of the tree device. The sketch was also submitted to Mr. Gorecki, a die maker and die cutter, who testified that he did not feel it practical for "stripping purposes" to make a die and to cut a tree figure with as sharply pointed branches as those drawn by Mr. Irving. Accordingly, he fashioned the tree in its present final form using Irving's drawing as his guide and attempting to make as many branches and to retain as far as possible the same general size and shape as indicated by Mr. Irving. Mr. Irving testified at trial "I was extremely disappointed when I found out it was impractical from a steel rule die production problem" to reproduce exactly the design as originally submitted. In view of the testimony of Mr. Gorecki (the defendant's own witness) that the sketch made by Mr. Irving was even closer to plaintiff's tree than defendant's final product,[15] it might well be inferred that such disappointment on Mr. Irving's part arose from the fact that he could not come as close to plaintiff's tree as he had desired.

Inferences aside, Mr. Gorecki's testimony is diametrically opposed to Mr. Irving's statement under oath that al-

---

"Q. Were you aware of the Car-Freshner Corporation's products? A. I certainly was.
"Q. Did you know about their little tree? A. I knew about all the products." (Transcript, page 187).

12. While the incorporators and officers of the defendant corporation are not being sued for unfairly competing in business with a former employer, their entire method of operation including the so-called "skunk episode" (perhaps unwittingly descriptive of conduct as well as product, and to be discussed in detail hereafter) is highly relevant and of probative value as to the issue of whether or not the defendant, acting through its

agents Caplan and Irving *intended* to and, in fact did, copy plaintiff's product.

13. The enclosed product was plaintiff's Car-Freshner tree.

14. Such advice was subsequently transmitted to Mr. Irving by letter of January 28, 1958 stating that the patent was directed to the means for closing the end of the cellophane container so sealing the cord for pulling the article from the envelope. The letter concluded "The patent has nothing to do with the article in the envelope itself which, so far as we know, is not patented at all."

15. "Q. Mr. Gorecki, a little while ago you were asked to look at the little trees

though defendant's product was designed without reference to plaintiff's Car-Freshner tree there "is a similarity in the finished unit but that was because of the technical difficulties we ran into." Accepting, as the court does, Mr. Gorecki's evaluation of the resemblance between plaintiff's and defendant's products, clearly the similarity between the two would have been even greater had technical difficulties not been encountered. Mr. Irving himself left no doubt in the court's mind as to whose testimony was worthy of belief by immediately continuing his above explanation as follows:

"The position of the tree was not what you have there but it was corrected by a die maker, and it was impossible to make that tree in the shape I originally created it, because I had a tree made up which has sharp edges on it, and he said that sharp edges would create too much trouble in making a die that way, and he finally took the tree and punched them out without sharp edges on it, and he wanted one which was round, and it was 3 x 4 inches, and we made it green because it was the most logical color." (Transcript, page 191.)

Later when asked to point out the differences between defendant's tree and plaintiff's tree, Mr. Irving twisted the facts with all of the consummate skill of a contortionist:

"Of course it is very hard to take a tree of this proportion unless you are going to use very sharp angles, so that the tree would be different from these [defendant's and plaintiff's products], unless you changed or put lots of different colors on them, thus making it uneconomical and uncompetitive.

on Plaintiff's Exhibit No. 2. [Sample of plaintiff's tree.] A. Yes, sir.
"Q. Do you think that they have sharper corners than the one you finally prepared for the Defendant, Defendant's Exhibit No. 13–A? [Sample of defend-

"Our tree is 3 x 4, and was made by the machine we already had, which was packaging a prior product, and this tree [defendant's] is taller by one-half inch and narrower, but I do not know exactly how much. I would say very slightly. I think the greatest difference is in the height." (Transcript, page 349.)

And in attempting to differentiate the branches on the two tree products, he testified:

"Ours has a series of regular breaks, and I can see what Mr. Gorecki did when he found it was impossible for him to use that design, and he rounded it out, and the Car-Freshner tree has what looks like more indentations or more rounded edges." (Transcript, page 350.)

As to the number of branches, in actuality, both trees have three small breaks at the bottom, followed by a noticeable break part way up and another noticeable break about two-thirds of the way up and the same number of branches. Mr. Irving, however, attracting his attention to the "small juttings out" managed to count twelve branches on plaintiff's tree as opposed to seven on the defendant's tree although even he was obliged to admit that the juts came in about the same position and that "no real attention was given to that until it was brought to our attention."

What Mr. Irving's attitude was when the "similarity" between the trees was brought to his attention is not without significance. Although both he and Mr. Caplan categorically denied under oath any copying, there was no denial of testimony by Mr. Samann that Mr. Irving when asked by Mr. Samann how he, Mr. Irving, thought that he could infringe with impunity on plaintiff's tree device, replied:

ant's tree.] A. I would say they have some sharper corners (indicating.)
"Q. In other words, the drawing which was brought to you was more like Plaintiff's Exhibit No. 2 in that respect than what you eventually came up with? A. Yes, sir." (Transcript, page 325.)

"Well, at the spur of the moment we didn't do it but we did this very carefully. My partner, Mr. Caplan, and myself and our financial backer, sat down together with our patent attorney and discussed this issue at length, and *we decided we could copy the tree and get away with it*."[16] (Transcript, page 45—emphasis supplied.)

Such an answer, in addition to not having been denied, would be characteristic of Mr. Irving who, when questioned as to *verbatim copying* of plaintiff's advertising literature, responded from the witness stand:

"A. * * * I will tell you this, I looked at it and I liked it and I used it.

"Q. Was that the general practice you follow in conducting your business, if you see something you like you use it? A. I anticipated that question, Mr. Conrad, but there are some things I like, that are available, and being free, being applicable I don't feel I have any reason to restrict myself from their use, and this happens to be one of them. The Air Wick uses a wick. We are an air deodorizer company and if something comes up that is descriptive of the kind of functions of our product—for example, we don't use a wick. There is no breakage and things of that general description. No, I think it is very appropriate we should use it.

* * * * * *

"Q. You feel that in the conduct of your business that you are justified in copying literally from your competitors' literature or from your competitors' products providing, as you say, it is free for that sort of thing? A. Mr. Conrad, I will have to say I don't feel free to copy that which—I will answer it specifically—in the case you just pointed out where I had used the word "Air Wick" I felt perfectly free to use that.

"Q. There is no compunction on your part about doing that sort of thing? A. There is no compunction on our part in doing it in reference to that particular lifting of that quotation there.

"Q. Does that also apply, for example, to the products of your competitors which you feel you might say aren't legally protected by some kind of a patent or copyright? A. That's right, we try to be original on everything we put out." (Transcript, pages 203–204, 205–206.)

To say that the testimony of Mr. Caplan and Mr. Irving as to their knowledge or possession of one of plaintiff's trees prior to the "creation" of defendant's product is unsatisfactory would be a singular and perhaps an unjustified example of judicial restraint. Witness Caplan testified that plaintiff's product was not mentioned or discussed at the meeting between himself and Mr. Irving during which the possibility of defendant corporation bringing out a tree product was explored and that, although disavowing any connection with defendant's pine tree other than participating in the initial decision to start manufacture of such an article, he "knew" that defendant did not copy from plaintiff; that the numerous similarities were "coincidences" and that when defendant's pine tree was designed, as far as he knew, there was not in defendant corporation's plant nor in his or Mr. Irving's possession any of the plain-

---

16. Mr. Irving's version of the same conversation is not essentially different.

"* * * I explained to Mr. Samann that we felt very strongly about the fact that the tree was a universal type of an item and that it was our belief that no one had the right, the exclusive right in the world to make a tree to the exclusion of anyone else making a tree in the form of a deodorant, and *there wasn't so much a question of the similarity between our trees, which I agreed there was, but it was a question of whether or not we had the right to make a tree, and that was the entire issue*." (Transcript, page 365—emphasis supplied.)

**36**

tiff's products, sales material or catalogues. Obviously if Mr. Caplan's connection with the defendant's tree shaped deodorant was as slight as he stated, he was not qualified to testify that defendant's product was not copied from plaintiff's product or that the admitted similarities were coincidences. Greater participation than testified to by Mr. Caplan was, however, indicated by defense witness Meyer's statement that *both* Mr. Caplan and Mr. Irving brought the original sketch of defendant's product to him for technical advice as to printing production problems [17] and that he from time to time talked over the phone, and in person, to both of them regarding the design, the placing of a notice of registration on defendant's tree product and approval of the proof and large press sheet.[18] Moreover, Mr. Caplan admitted to complete knowledge of defendant's policies in regard to freight allowances. His willingness to attempt to explain illogical, verbatim copying by defendant from plaintiff's freight allowances [19] detracts from the credibility of any of his testimony. In addition, Mr. Irving directly contradicted Mr. Caplan's denial of knowledge by Mr. Caplan of possession by the defendant of the plaintiff's product prior to the "creation" of defendant's tree deodorant and made the following incredible explanation of Mr. Caplan's testimony:

"Q. Did you consult with Mr. Caplan about the matter you put up to Mr. Clark [defendant's patent counsel] in your letter of November 25, 1956 [1957]? A. Oh, yes.

"Q. You testified a little earlier that in that letter you had enclosed one of the plaintiff's trees? A. Yes.

"Q. I am going to read to you the answer Mr. Caplan made to a question asked him by the court at page 144 of the transcript?

" 'The Court: So far as you know, Mr. Caplan, when your "Lucky Pine" was designed was there in the building or in the possession of either you or Mr. Irving, so far as you know, any of the Plaintiff's products or sales material or catalogues?'

"Mr. Caplan answered that question:

" 'Absolutely not, sir. Absolutely not.'

"A. That is correct.

"Q. What is the explanation? A. Of what?

"Q. For the fact that as of November 25th you had in your premises a Plaintiff's tree which you could send to Mr. Clark. A. When *we decided* to make the tree *we saw* the patent mark on a tree in the service station. *We purchased* the tree, sent it to Mr. Clark, and that was the only time *we* had any possession of it.

17. Transcript, page 229, page 256.

18. Transcript, pages 265–266, 270.

19. Price lists for Car-Freshner products appear on one side of a sheet of paper and on the reverse side of the same sheet jobber prices for "Milak" deodorizers are listed, Milak being a wholly-owned subsidiary of the plaintiff Car-Freshner corporation. In order to encourage sales plaintiff prepays the freight on certain minimum quantity orders of its products and thus to facilitate ordering, on the side of the sheet setting out prices of "Car-Freshner" products appears the notice " 'Milak' Products can be included to reach minimum quantity for freight allowance" and on the side of the sheet setting out prices of "Milak" products appears the notice " 'Car-Freshner' Products can be included to reach minimum quantity for freight allowance." These notices indicate to the customer that part of one order can be ordered from one company and part from the other company. Defendant, a corporation with no subsidiary, has on its price lists for "Marlenn" deodorizers the notation "Marlenn Products can be *included* (emphasis supplied) to reach minimum quantity for freight allowance", a notice which as applied to the defendant corporation has no meaning whatsoever. By its slavish and stupid copying of plaintiff's literature the defendant has more adequately characterized its purposes, intent and motives than could this court.

"Q. The explanation of this testimony as I understand it, then, is that you didn't have any tree of the Plaintiff in your possession on the premises because of the fact that you had sent the tree to Mr. Clark? A. That is correct." (Transcript, pages 435–436; emphasis supplied.)

Aside from the remarkable similarity between plaintiff's and defendant's products and defendant's admission of verbatim copying or "lifting" from plaintiff's advertisements, the display easels of both parties hereto also bear an identity in context, arrangement of material and pictorial display. The similarities noted in the products of and displays used by the parties are sufficient to support an inference of fraudulent intent on the part of defendant but such fraudulent intent is further established by defendant's use of a registration notice on its tree product. Defendant does not own any registration for any feature or symbol appearing on its tree. However, defendant, again slavishly copying, placed the notice in the center of its tree slightly above the slanted panel in precisely the same location that plaintiff places its registration notice. Defendant contends that the use of the notice was a mistake and indeed it was—a mistake which reveals the true intent of the defendant. Defendant's explanation that the use of the "R" was a "mistake" is incredible. Mr. Caplan could not explain the use of the notice "R" although the matter was discussed with him and Mr. Irving. Mr. Irving describes the use of the "R" as a "mistake" although it was not used in connection with the other products of the defendant. He testified "when I took the sketch to the printer he asked me did we intend to have it registered and at the time I told him we did, so he went ahead and put the 'R' on." The sketch was allegedly prepared in November, 1957. However, the defendant had been advised by its attorney as early as August, 1956 as to what constituted proper markings on its products. The court concludes that defendant well knew that the "R" could not be used unless a registration did in fact exist. Defendant's first product carried a small "t" within a circle, the use of which Mr. Irving likewise could not explain. The testimony of the printer, Mr. Meyer, is also contradictory and not worthy of belief. Meyer, a defense witness, testified on direct examination that he "called the customers" with regard to the notice; and that it was his experience that the Patent Office "will not accept it unless the 'R' is actually printed thereon * * *" that he always asked his customers "if they want the 'R' there;" that the question of the notice of registration was on a "reminder list" and that he talked to both Irving and Caplan about the notice, a telephone call having been made to them prior to the setting of the type, and that thereafter both Irving and Caplan were satisfied with the large press sheet submitted to them by Mr. Meyer which contained forty-nine prints of defendant's trees each bearing a notice of registration. The court has been most fortunate in this case in not having to choose in regard to veracity between conflicting, contradictory testimony of any two defense witnesses as to any one given fact. Mr. Meyer, as was the wont of Mr. Caplan and Mr. Irving,[20] obligingly supplied the

---

20. The quality and worth of all of the testimony offered on behalf of the defendant is attested to by defense counsel's statement in his brief that "defendant's testimony was too contradictory." (Defendant's brief—after trial—page 45). In addition there is considerable testimony in the record concerning a pine tree manufactured by Continental. Much of the testimony in connection with this company, particularly Continental's volume of sales of this item, was given by Mr. Irving, who upon the last day of trial admitted that his previous testimony was untrue. In fact, Irving's confession was made only when he was aware that the falsity of his previous testimony was to be proven by the plaintiff. At the time of his confession, Mr. Irving knew that a Mr. Praydis was to testify on behalf of plaintiff as to the extent of Continental's sales and knew also that the

court with a second, completely different, version of how the notice of registration became affixed to the defendant's product. According to this second version, Mr. Meyer did not recall any conversation with Mr. Irving or Mr. Caplan of the nature to which he had previously testified; but the "R" was placed on defendant's product before he talked to Mr. Irving and Caplan; it was done on Meyers own initiative as he takes it upon himself to protect any "new name" by placing "R" on the labels but he cannot recall why the "R" was placed in precisely the same location as plaintiff uses for its registration notice. The court considers the contradictory and irreconcilable testimony of Mr. Meyers as to how and why the notice of registration became affixed to defendant's tree product absolutely worthless. Viewed in the light of Mr. Irving's admitted "lifting" of those portions of plaintiff's advertising literature that he "liked" and thought "appropriate" and in light of the other indicia of deliberate, wilful copying of plaintiff's trees, display cards and price lists, heretofore described, defendant's use of and location of the notice of registration can only be construed as fur-

ther evidence of defendant's fraudulent intent. The court finds as a fact and concludes as a matter of law on the basis of the foregoing evidence that the plaintiff has established beyond any doubt deliberate, wilful copying by defendant of plaintiff's tree product with fraudulent intent.

■ As the intent of the defendant is a factor to be considered in this action, in addition to the above referred to ample evidence of fraudulent intent on the part of the defendant, the court admitted over defendant's objection testimony relative to the so-called "skunk episode." In Wood v. United States, 1842, 16 Pet. 342, 360, 41 U.S. 342, at pages 359–360, 10 L.Ed. 987, the court stated:

"* * * The question was one of fraudulent intent or not; and upon questions of that sort, where the intent of the party is matter in issue, it has always been deemed allowable, as well in criminal as in civil cases, to introduce evidence of other acts and doings of the party, of a kindred character, in order to illustrate or establish his intent or mo-

books of the Continental corporation were not destroyed but would be produced in court on that very day. Mr. Irving's testimony resulted in defense counsel making the following remarks:

"Your Honor, I think there has been inconsistency between Mr. Irving's statements. I think Your Honor will see they have largely been in the nature of exaggeration. Some of them have been untruths. To say that they are deliberate untruths I think would be an abuse of the gentleman.

"Mr. Irving was associated with a man doing some difficult things, doing them wrongly. There has been no question there would be a tendency to do some of the things. There is one tendency, for one thing to exaggerate in this business.

"That appears to be true, that both parties, as to their products and their advertising, to exaggerate, a great tendency was to exaggerate.

"Of course, an exaggeration is not necessarily false, as some of this testimony has been, although it has been

given, I believe, in the interest to get at the truth, but actually it didn't get at the truth. I am certainly ready to admit that. It was too much anxiety on the part of Mr. Irving to satisfy both his counsel and Mr. Conrad and myself and Your Honor, to try to find some possible basis for these exaggerated claims. They are mistaken." (Transcript, pages 511–512).

Other contradictions in Mr. Irving's testimony exist and are, in fact, so numerous that the court will merely note as instances and not attempt a resumé of the directly contradictory statements of the witness as to (a) whether or not defendant's tree display card was designed before defendant's tree product; (b) whether or not defendant's display card was designed without reference to plaintiff's display card; (c) whether Continental made a substantial profit or lost money on its tree product; and (d) whether or not Mr. Irving would have known how many of Continental's trees were returned or rejected by its retailers.

tive in the particular act directly in judgment. Indeed, in no other way would it be practicable, in many cases, to establish such intent or motive, for the single act, taken by itself, may not be decisive either way; but when taken in connection with others of the like character and nature, the intent and motive may be demonstrated almost with a conclusive certainty."

See also Webster v. P. W. Moore & Son, 1908, 108 Md. 572, 592, 71 A. 466; Conservation Company v. Stimpson, 1920, 136 Md. 314, 331, 110 A. 495; Van Lill Company v. Frederick City Packing Company, 1928, 155 Md. 303, 314–316, 141 A. 898; Reinhart v. Cunningham, 1932, 162 Md. 698, 157 A. 896, 897; Wigmore on Evidence, Vol. 2, 3rd Edition, section 302, Theory of Evidencing Intent, pages 200–201; 32 C.J.S. Evidence § 580, p. 436.

Title 19 U.S.C.A. § 1304 requires the marking of imported articles and, if they are not marked as required, the imposition of additional duties; and the imposition of penalties for concealing or removing the marking. The Act is enforced by the United States. The Act includes subsection (a) (3) (G) of section 1304 which provides that if the article is to be processed in the United States so that such processing would *necessarily* obliterate or destroy the marking of the country of origin, then the notation of that country origin is not required. In the instant case both plaintiff and defendant imported small chenille figures of skunks bearing a string around which was marked on paper apparently glued to the string the name of the country of origin, Japan. These small figures were then subjected to a treatment in this country with a deodorant oil and inserted in transparent bags and mounted on display cards for sale. Plaintiff contends that defendant deliberately, intentionally and unlawfully removed from defendant's skunk product markings indicating foreign manufacture. The parties have stipulated that out of 216 skunks obtained from defendant's factory prior to processing, and thus still in the condition in which they were purchased from defendant's buyer, only 14 were found either to be completely lacking in labels or to have defective labels. In contrast, after "processing" by defendant, out of 57 of defendant's skunks, contained on five display cards obtained by plaintiff from five different states, not one perfect label with the word "Japan" clearly decipherable could be observed by the court. Most of the 57 skunks had no labels at all; some only remnants of a label; and on those few having an entire label the lettering was not clearly discernible. On the other hand, plaintiff submitted a display card containing seven of plaintiff's skunks. All seven bore complete labels with "Japan" legibly and distinctly marked thereon.

Defendant's position is that during the treatment of the little skunks with the deodorant oil and their insertion into bags the small labels sometimes were brushed off and sometimes the glue was dissolved so that the labels fell off. This explanation is unsatisfactory. It does not explain why plaintiff's labels remain on and defendant's do not, or why defendant could not have specified, as does the plaintiff, when ordering the skunks that if glue is to be used in their manufacture it will be water soluble glue which is not affected adversely by the deodorant oils thereafter employed in processing the skunks. Again the contradictions, the changes, the evasions and the tortured explanations in the testimony of Mr. Caplan and Mr. Irving relative to the "skunk episode" tend strongly to indicate that both of them knew that virtually none of defendant's skunks was properly marked when offered for sale; that such lack of markings was deliberately, intentionally brought about by defendant acting through Mr. Caplan and Mr. Irving; and that Mr. Caplan and

Mr. Irving knew that what they were doing was unlawful.[21] Just as revealing in regard to defendant's intent as the lack of legible markings on the imported chenille figures themselves is the presence of a clearly apparent legend on each of defendant's display cards containing its skunks, reading "Made in U. S. A.— Printed in U. S. A." Neither witness could give any explanation for the use of the wording "Made in U. S. A." The court can conclude only that defendant's activities in regard to the "processing" and displaying of its skunk product constitute a calculated, intentional fraud and deception upon the public and serve to demonstrate "almost with a conclusive certainty" that defendant's activities in regard to the "creation" of its tree product were permeated with a fraudulent intent to pass or palm its tree product off on the public as plaintiff's tree product.

Defendant's business "ethics" are further clearly revealed by its ready admissions of false advertising in regard to its tree product as well as other deodorants manufactured by it. Defendant's jobber price lists contain among other allegations the statement that defendant's deodorizers are "proven to last longer by United States Independent Standard Tests. Winners of National Merchandise Display Awards." Its catalogue sheets contain similar "ballyhoo" (Mr. Irving's choice of language). In truth and in fact no display awards were won by defendant and the "United States Independent Standard Tests" were conducted by defendant itself and consisted of Mr. Irving taking several deodorant products from different competitors and hanging the deodorants up in defendant's factory. Sometime thereafter he smelled each deodorant and "thought" that defendant's products lasted longer. He was asked at the trial if the so-called test was not in fact meaningless and replied "that's right, only to us."

 The physical appearance of goods or products may not be copied or imitated, if the copied or imitated feature is nonfunctional, has acquired a secondary meaning, and if the copy or imitation is likely to cause confusion in trade (A.L.I. Restatement, Torts, Section 741). Generally, in the absence of a patent, trademark or copyright, the functional features of a product may be copied. However, where a manufacturer engages in the unnecessary imitation of the nonfunctional parts of the product of a competitor, which imitated features have acquired a secondary meaning, to the extent that the two articles are substantially identical in appearance, and re-

21. When Caplan's deposition was taken prior to trial, he testified "there is no units that go out without the 'Made in Japan' sticker on it" and that it was impossible to have a display card of twelve units with twelve stickers obliterated.

At the trial Caplan first testified that the fact that the stickers were "coming off" was called to his attention in February or March 1959 (R. 168–169); then that in the latter part of 1958, he had noted that some of the units "did not have the stickers" (R. 162–164) and finally that he was aware the "stickers have been coming off" since the defendant first started to process the skunks in August 1958.

As to his knowledge of the customs law involved, Mr. Caplan was asked:

"Q. You are aware that the laws of the United States require that something imported into the United States must bear a legend showing that thing? A. I am not aware exactly that we are committing any crime. I am sure that the parties who would be in charge would have gotten in touch with us as to what crime we were perpetrating.

"Q. Were you aware of some such law? A. Only through hearsay."

Mr. Irving was present at the time of Caplan's deposition and read over the testimony of Caplan, and at that time, he knew the stickers were coming off. He, however, at trial accepted as true and adopted Mr. Caplan's deposition testimony that no units went out without labels and that it would be impossible for a display card of twelve units to be shipped out from defendant's factory with all twelve labels missing, but upon further examination by the court he reversed himself and admitted that he was not in agreement with Caplan.

tail purchasers are thus likely to mistake one for another, he is chargeable. (Enterprise Mfg. Co. v. Landers, Frary & Clark, 2 Cir., 1904, 131 F. 240; Yale & Towne Mfg. Co. v. Alder, 2 Cir., 1907, 154 F. 37; Rushmore v. Manhattan Screw & Stamping Works, 2 Cir., 1908, 163 F. 939, 19 L.R.A.,N.S., 269; Wesson v. Galef, D.C.N.Y.1922, 286 F. 621.) A feature of the goods is functional, if it affects their purpose, action or performance, or the facility or economy of processing, handling or using them; it is nonfunctional if it does not have any of such effects (A.L.I. Restatement, Torts, section 742).

"* * * The determination of whether or not such features [the shape of a container] are functional depends upon the question of fact whether prohibition of imitation by others will deprive the others of something which will substantially hinder them in competition.

"A feature is non-functional if, when omitted, nothing of a substantial value in the goods is lost. A feature which merely associates goods with a particular source may be, like a trade-mark or trade name, a substantial factor in increasing the marketability of the goods. But if that is the entire significance of the feature, it is non-functional; for its value then lies only in the demand for goods associated with a particular source rather than for goods of a particular design." (A.L.I. Restatement, Torts, section 742, Comment a.)

This court has already held that the shape of a dry deodorant is not a functional feature of the product in that its shape in no way affects the deodorant's purpose, action or performance. If its shape were other than a tree, nothing of any substantial value would be lost with respect to the alleged quality of its fragrance or its ability to retain its alleged fragrance. Likewise, plaintiff's design is nonfunctional. Plaintiff's panels are not essential or necessary to the function of the goods nor do they affect the facility or

economy of processing the goods as urged by defendant. Defendant sought through the testimony of its printer Mr. Meyer to prove that a Chinese copy of plaintiff's tree was the only manner in which a *competitive* tree shaped deodorant could be produced. As previously noted the testimony of witness Meyer with respect to the use of the "R", was so contradictory as to defy understanding. Likewise his statements relative to this issue were contradictory and unworthy of belief. After considerable testimony with regard to the need of employing offset lithography rather than reverse printing in order to eliminate running and filling of the letters during printing, the witness could not explain why he did not, and did not expect to, encounter a running problem which would obscure defendant's registration notice placed, as it was, in the center of a large mass of green ink. This witness also testified that while the white panel appearing on the body of the tree might be an "eye-sore" it helped to accentuate the words "Lucky Pine" and that the panel was slanted for reasons of artistry. What constitutes an artistic endeavor is purely a matter of opinion and personal taste. The court's own impression was that a straight panel made the tree appear firmer. It is not without significance that Meyer could not explain why the slanted panel appearing on defendant's tree was of the same dimensions as the slanted panel appearing on plaintiff's tree; why it was slanted in the same direction; or why its angle of inclination was equal to the angle of inclination of the panel of plaintiff's tree. In the light of Mr. Meyer's contradictory testimony and what was practically tantamount to a refusal on his part to make, regarding the so-called problem of running, an explanation in support of his statements allegedly based upon his twenty to twenty-five years of experience as a printer, the court cannot and does not accept the contention that the similarities noted between plaintiff's and defendant's tree products were due to "coincidence" or printing difficulties. Accord-

ingly, the court holds that the features copied by defendant were nonfunctional.

▓▓▓▓ Plaintiff has proven that prior to defendant's introduction into the market of its tree shaped deodorant in February 1958, plaintiff's tree device had already acquired a secondary meaning:

> " 'Secondary meaning' is *association*, nothing more. It exists only in the minds of those who identify some article of commerce * * * by some name or sign and associate the two in their minds." (Nims, Unfair Competition and Trade-marks, 4th Edition, Vol. 1, section 37, page 154.)

In addition to the extent of plaintiff's sales, advertising [22] and uses of its tree device previously mentioned, plaintiff offered into evidence without objection by defendant approximately one thousand letters of inquiries for plaintiff's product which established that an association between the symbol and the plaintiff's product does exist in the minds of the purchasing public. Many of the inquiries contain sketches of plaintiff's tree symbol including the white box and the slanted panel, and in many instances the words "Car Freshner" are omitted. Many refer to the deodorant as "your little tree", "Little Tree" deodorant, or "your pine tree deodorant", or "your Forest Air" pine tree. Still others are in the nature of testimonials, praising the fragrance of plaintiff's product, and their over-all quality. More than seventy-five per cent of the inquiries received by plaintiff, and which comprise plaintiff's exhibit, are dated prior to defendant's first use. Such evidence is "competent as showing the state of mind of prospective purchaser." (S. C. Johnson & Son, Inc. v. Johnson, D.C.N.Y.1939, 28 F.Supp. 744, 749, modified as to extent of injunctive relief, 2 Cir., 1940, 116 F.2d 427, 48

U.S.P.Q. 82). Plaintiff submitted testimony that these inquiries and testimonials are merely a representative sampling of the type of letter received by plaintiff and that there 'are thousands of others. Because of this public acceptance and association, plaintiff on or about December, 1955, began using on its stationery, invoices and advertising material which already carried a pictorial representation of its tree device the motto "Manufacturers of the Famous 'Little Trees.' ". The use of this motto emphasized and has continued to emphasize in the minds of the purchasers the association between the plaintiff's tree device and the source of plaintiff's brand of goods. Likewise it evidences that such an association did, in fact, exist no later than December, 1955.

As stated by Chief Judge Thomsen of this district "Federal law and Maryland law agree that the essential element of unfair competition is deception, by means of which the goods of one dealer are passed off as the goods of another. Goodyear's Rubber Manufacturing Co. v. Goodyear Rubber Co., 128 U.S. 598, 9 S.Ct. 166, 32 L.Ed. 535; Edmondson Village Theatre v. Einbinder, [1955, 208 Md. 38,] 116 A.2d 377, 380. 'The essence of the wrong in unfair competition consists in the sale of the goods of one manufacturer or vendor for those of another; and if defendant so conducts its business as not to palm off its goods as those of complainant, the action fails.' Howe Scale Co. of 1886 v. Wyckoff, Seamans, etc., 198 U.S. 118, at page 140, 25 S.Ct. 609, 614, 49 L.Ed. 972. This rule has been reiterated by the Supreme Court, Hanover Star Mill Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713, and by the Courts of Appeals for the various circuits, most recently in West Point Manufacturing Co. v. Detroit Stamping Co., 6 Cir., 222 F.2d 581, 586, et seq., where many cases are reviewed."

---

22. In a not dissimilar case, Ross-Whitney Corp. v. Smith Kline & French Laboratories, 9 Cir., 1953, 207 F.2d 190, the court held that the orange color and valentine-like heart shape of plaintiff's drug had acquired a secondary meaning.

The court noted that the color and shape were widely advertised by the plaintiff therein and were employed for the purpose of identifying the source of the product.

(Bechik Products, Inc. v. Federal Silk Mills, Inc., D.C.Md.1955, 135 F.Supp. 570, 577).

In the instant case, secondary meaning having been established by plaintiff, there are the following elements to be considered on the issue of "palming off" —the degree of similarity between plaintiff's and defendant's products; the intent of the defendant; the marketing methods of the parties; and the degree of care likely to be exercised by purchasers. As previously noted the resemblance between the two products is to say the least remarkable. The mere fact the defendant places on its Chinese copy of plaintiff's product the words "Lucky Pine" where plaintiff uses the legend "Car-Freshner" and defendant prints its corporate name in small letters on the base panel of the tree is not of itself sufficient to prevent confusion on the part of the purchasing public. (W. G. Reardon Laboratories, Inc. v. B. & B. Exterminators, Inc., D.C.Md.1933, 3 F.Supp. 467, 476, 17 U.S.P.Q. 406, modified as to cause of action for trade-mark infringement, 4 Cir., 1934, 71 F.2d 515, 22 U.S.P.Q. 22). Not only is the similarity between plaintiff's and defendant's products striking, it is also unnecessary as proved by the defendant itself. To negate novelty or imaginativeness in plaintiff's use of a tree shaped deodorant, defendant submitted a number of patents and of registrations showing marks comprising a tree symbol. None of these patents or registrations discloses a tree having the same outline and appearance as plaintiff's or defendant's trees. None of the registrations discloses a slanted panel or a block-like base. In fact, the registrations as well as the patents reveal that the defendant had at its disposal myriad variations which it could have employed but instead deliberately and wilfully copied and imitated the product of the plaintiff.

Where "as here myriad variations are available to the misappropriator, the case is mildly put by saying his very act of copying strongly impels the inference that he intends to reap commercial gain by trading on the good will of the first comer." (Ramirez & Feraud Chili Co. v. Las Palmas Food Company, Inc., D.C.Cal.1956, 146 F.Supp. 594, 605, affirmed per curiam, 9 Cir., 1957, 245 F.2d 874, 114 U.S.P.Q. 473, certiorari denied 1958, 355 U.S. 927, 78 S.Ct. 384, 2 L.Ed.2d 357; See also: A.L.I. Restatement, Torts, section 729(b), Comment f.) In unfair competition, it is not essential to show intent to deceive, but such intent, if shown, raises a strong presumption that deception has resulted and the alleged infringer has the burden of going forward with proof that confusion is not likely. National Van Lines v. Dean, 9 Cir., 1956, 237 F.2d 688, 692; My-T Fine Corporation v. Samuels, 2 Cir., 1934, 69 F.2d 76, 77. In the instant case the court has specifically found wilful, deliberate copying on the part of the defendant with a fraudulent intent to deceive. The decision of Judge Learned Hand in My-T Fine Corporation v. Samuels, supra, on the question of unfair competition, meets the facts of this case very closely. There the plaintiff employed the name "My-T Fine", whereas the defendants used the word "Velmo" on their packages. In finding unfair competition, Judge Learned Hand stated that intent to deceive creates a presumption that purchasers will be deceived and found that:

"In the case at bar, it seems to us fairly demonstrated that the defendants have copied the plaintiff's make-up as far as they dared. * * * At the very outset the directions were lifted bodily from the back of the plaintiff's box; and although the defendants were within their rights as to that, still the circumstance is relevant because it proves that the box had been before them when they designed their own make-up, and that it had been their point of departure. In addition they took solid green for the body, and put on a chevron; and while perhaps they did not choose a general combination of red and green, at least they adopted a red lettering. Whether or not

they meant to get hold of the plaintiff's customers by that make-up, their next step was bolder, and put their intent beyond question; they added the red stripes at every edge; so that the real differences that remained were only in the name and the color of the chevron. As they had not the slightest original interest in the colors chosen and their distribution, they could only have meant to cause confusion, out of which they might profit by diverting the plaintiff's customers. This being the intent, the dissimilarities betwen the two do not in our judgment rebut the presumption." (69 F.2d at page 77).

The parties hereto, being manufacturers of dry air deodorants, are in direct competition, selling through the same channels of trade (jobbers). The products are usually displayed on counters, gasoline pumps and the like, and are purchased by the general public. Where goods are identical and sold through the same channels of trade and to the same class of purchasers, less similarity than might otherwise be required may lead to confusion. (A.L.I. Restatement, Torts, section 729, Comment g; Pure Foods, Inc. v. Minute Maid Corp., 5 Cir., 1954, 214 F.2d 792, 102 U.S.P.Q. 271, certiorari denied 1954, 348 U.S. 888, 75 S.Ct. 208, 99 L.Ed. 697; Neilson Chemical Company v. Halpern, Patent Office Trademark Trial and Appeal Board, 1959, 120 U.S.P.Q. 500). Also significant on the question of likelihood of confusion are the buying habits of purchasers of the goods involved. (A.L.I. Restatement, Torts, section 729, Comment g; Maternally Yours, Inc. v. Your Maternity Shop, Inc., 2 Cir., 1956, 234 F.2d 538). The goods of the parties to this suit are inexpensive and impulse items. Mr. Irving testified:

" * * * The item is so much of an impulse item, you want to make people reach in their pockets and take out a few cents for this kind of merchandise, and that is a very difficult thing to do.

"Q. What do you mean an impulse thing, they examine that very carefully before buying it don't they? A. If you watch them, Mr. Conrad, I beg to differ with you, they are waiting for their change in a service station and they happen to glance up and see this and they say: 'I can use one of these', and they will part with their money for it."

Judge Chesnut in W. G. Reardon Laboratories, Inc. v. B. & B. Exterminators, Inc., supra, 3 F.Supp. 467, 476 commented:

" * * * The mere fact that the defendant places its name upon its carton is not of itself sufficient to prevent confusion. *Purchasers, especially of an article of this kind, are not apt to be meticulous in reading all the printed matter on the cartons. A superficial impression is usually sufficient for them.* Tillman & Bendel v. California Packing Corp. (C. C.A.) 63 F.2d 498, 508." (Emphasis supplied.)

The concept of confusion applies principally to the purchasing public and not to the jobbers. In Warner & Co. v. Eli Lilly & Co., 1924, 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161, where the evidence disclosed many instances of passing off by retailers of petitioner's product when respondent's was called for, the Supreme Court stated in 265 U.S. at pages 530 to 531, 44 S.Ct. 617:

" * * * That no deception was practiced on the retail dealers, and that they knew exactly what they were getting, is of no consequence. The wrong was in designedly enabling the dealers to palm off the preparation as that of the respondent. *Coca Cola Co. v. Gay-Ola Co.* [6 Cir.], 200 F. 720; *N. K. Fairbank Co. v. R. W. Bell Manuf'g. Co.* [2 Cir.], 77 F. 869, 875, 877–878; *Lever v. Goodwin,* L.R. 36 Ch.Div. 1, 3; *Enoch Morgan's Sons Co. v. Whittier-Coburn Co.* [C.C.], 118 F. 657, 661. One who induces another to commit a fraud and furnishes the means of consummating it is equally

guilty and liable for the injury. *Hostetter Co.* v. *Brueggeman-Reinert Distilling Co.* [C.C.], 46 F. 188, 189."

See also W. G. Reardon Laboratories, Inc. v. B. & B. Exterminators, Inc., supra, 3 F.Supp. 467, 475; A.L.I. Restatement, Torts, section 712, Comment e. Plaintiff has established that the defendant has furnished its dealers with the means of creating confusion. The stipulated testimony of plaintiff's paid shopper evidenced instances of deliberate "palming off". The shopper covered the cities of Baltimore and Philadelphia. On December 29, 1958; December 30, 1958 and January 2, 1959 he called for the product in either one of the following ways:

Statement No. 1—

"Do you have any of those car deodorants in the shape of a tree with a white rectangle in the center and a box at the bottom?

Statement No. 2—

"Do you have any of those little 'Car-Freshner' trees with the box at the bottom that you use to hang up in a car for a deodorant?"

On May 4 and 5, 1959 he used one or the other of the following questions:

Statement No. 1—

"Do you have any 'Car Freshner' tree deodorant with a white slanted panel and a white box at the bottom?

Statement No. 2—

"Do you have any air deodorant in the shape of a tree with a slanted white panel and the white box at the bottom?"

Two of the above statements contained a specific reference to plaintiff's registered trade-mark "Car Freshner." In any event, regardless of the statement employed, the shopper in many instances received the product of the defendant, and in some instances the product of the plaintiff. In most cases if the shopper objected to the receipt of the defendant's product and further described plaintiff's

product as being taller and slimmer, the clerks replied "It is the same thing" or in words of similar import.

The stipulated testimony of plaintiff's shopper, together with plaintiff's supporting exhibits 34F through 34AA consisting of the tree products offered in response to the above mentioned statements (and thereafter purchased by said shopper), are admissible and have probative value. Similar testimony was received by the Circuit Court No. 2 of Baltimore City in Madera Wine & Liquor Co. v. RWL Wine & Liquor Co., 1954, 100 USPQ 173, as evidence of either conscious or unintentional substitution by retailers, the court saying at page 178:

"I accept as credible the evidence of the witnesses Todd and Spencer, and therefore find, that there has been either conscious or unintentional substitution by retailers. I have given due consideration to the fact that these witnesses are investigators and were employed to seek evidence for the purpose of the case. The narration of their shopping efforts impressed me as being truthful. In most such cases evidence of substitution is not available and is not necessary, and it is seldom that evidence of substitution is communicated by the ultimate consumer to the plaintiff in such cases. The method adopted by the plaintiff is acceptable, Hennessy, et al. v. Wine Growers Assn., 212 F. 308 (D.C.S.D. N.Y.1914); Julius Kessler & Co. v. Goldstrom, 177 F. 392 (C.C.A. 8, 1910). It was not feasible, or necessary, to shop each of the 1,800 to 2,000 retail dealers who defendant deals with in Baltimore."

See also House of Westmore, Inc., v. Denney, 3 Cir., 1945, 151 F.2d. 261, 264.

■■■ Plaintiff has fully established beyond any doubt that its product acquired a secondary meaning prior to defendant's entry into the field; that defendant slavishly and unnecessarily copied the unique, nonfunctional features of plaintiff's product; and that defend-

ant's imitation of plaintiff's product was initiated and executed with the intent to "palm off" its product as plaintiff's product. Moreover, the record amply supports a finding of passing off and deception on the part of the defendant's dealers, jobbers and distributors. The tendency of the law is "in the direction of enforcing increasingly higher standards of fairness or commercial morality in trade." Ross-Whitney Corp. v. Smith Kline & French Laboratories, 9 Cir., 1953, 207 F.2d 190, 196; Q-Tips, Inc. v. Johnson & Johnson, 3 Cir., 1953, 206 F.2d 144, 145, certiorari denied 1953, 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377; A.L.I. Restatement, Torts, Introductory Note to Chapter 35—"Confusion of Source."

■ "Our moral standards are well sustained and the public interest in free competition is advanced, where a court of equity forbids the immoral act of misappropriation by exact copying of the goods or services of another." Ramirez & Feraud Chili Co. v. Las Palmas Food Company, supra, 146 F.Supp. 594, 605, citing International News Services v. Associated Press, 1918, 248 U.S. 215, 236, 239–240, 246–248, 258–262, 39 S.Ct. 68, 63 L.Ed. 211; and the dissent of Judge Clark in Briddell, Inc. v. Alglobe Trading Corp., 2 Cir., 1952, 194 F.2d 416, 421–422. Under the facts and the applicable law the court holds that the plaintiff has sustained its right to relief based upon its second cause of action alleging unfair competition on the part of the defendant. Actionable harm may result to the plaintiff either from the likelihood (a) of loss of customers, (b) loss of reputation, or (c) of both. In such a case, the loss can result from a customer's belief that the competing article derives from the same source as that of the party complaining

and it does not matter whether customers know just who is the source. Accordingly, the defendant will be enjoined from further acts of unfair competition; be required to account and pay over to the plaintiff all gains or profits derived from its unfair competition; be required to pay to plaintiff all damages sustained by plaintiff by reason of defendant's unfair competition; be required to pay the costs of this suit; but notwithstanding the wilful nature of defendant's conduct and the deceit practiced by the defendant, the court is without authority in the absence of an applicable statutory provision to grant plaintiff, as requested in its bill of complaint, treble damages and its attorneys' fees as such a recovery would constitute an assessment in the nature of exemplary or punitive damages which this court, functioning as a court of equity, has no power to award. (Coca-Cola Co. v. Dixi-Cola Laboratories, Inc., et al., 4 Cir., 1946, 155 F.2d 59, 63–64, 64–65, certiorari denied 1946, 329 U.S. 773, 67 S.Ct. 192, 91 L.Ed. 665, 71 U.S. P.Q. 328).

As to defendant's counterclaim requesting cancellation of plaintiff's trademark registration No. 595,047 dated September 14, 1954, maturing out of an application filed September 25, 1952, in view of the court's previous holding in this opinion that such registration was improperly granted as of 1954, the court will order the registration cancelled.

An appropriate decree will be signed on presentation; the court reserving jurisdiction for the assessment of damages if the parties are unable to agree upon them.

The foregoing opinion embodies the court's findings of facts and conclusions of law. Federal Rules of Civil Procedure, No. 52(a), 28 U.S.C.A.